**UNITED STATES of America, Appellee,**

v.

**Lee Alton PRESLER, a/k/a Robert Ray Presler, a/k/a Robert L. Curtis, Appellant.**

**No. 79–5043.**

United States Court of Appeals, Fourth Circuit.

Argued July 13, 1979.

Decided Nov. 29, 1979.

Michael S. Scofield, Charlotte, N. C., for appellant.

Wayne C. Alexander, Asst. U. S. Atty., Charlotte, N. C. (Harold M. Edwards, U. S. Atty., Asheville, N. C., and Harold J. Bender, Asst. U. S. Atty., Charlotte, N. C., on brief), for appellee.

Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and WIDENER, Circuit Judge.

### DONALD RUSSELL, Circuit Judge:

The defendant appeals his conviction of the crimes of "fraud by wire" (18 U.S.C. § 1343) and of transportation in interstate commerce of fraudulently obtained property worth more than $5,000 (18 U.S.C. § 2314). The charges against the defendant grew out of a loan application by one Altman, a Myrtle Beach, South Carolina, real estate developer, induced by the defendant, who, using a false name, claimed to be a loan broker operating out of Charlotte, North Carolina, with close ties to the Teamster's Union in Illinois. The Government contended that the defendant represented to Altman that for an advance fee he would be able to secure for him a loan on a condominium being constructed by him at Myrtle Beach. Assuming the truthfulness of defendant's credentials, Altman began negotiations with the defendant as broker, looking to a loan of $1,250,000 on the condominium project. After several weeks' negotiations, including several telephone calls between the defendant in Charlotte, North Carolina, and Altman in Myrtle Beach, South Carolina, it was agreed that the defendant as broker would procure a loan on behalf of Altman in the amount of $1,250,-000 in Chicago. The defendant was to receive for his services a brokerage fee of $50,000 plus a unit in the condominium project.

Pursuant to the understanding between them, the defendant and Altman went to Chicago to complete the loan. Altman carried, as contemplated by the agreement between him and the defendant, $50,000 in cash, which he was to pay to the defendant as a fee for procuring the loan. Included in the cash so carried by Altman was $35,000, procured by him from the First Union National Bank in Charlotte still in the original wrappers as delivered to Altman by the bank. The loan itself was to be received by Altman partially in cash ($250,000) and partially by a bank transfer ($1,000,000).

From this point there is a certain amount of confusion in the testimony, particularly that of Altman. Altman testified on direct examination that on the morning the loan transaction was to be completed, he delivered to the defendant the $50,000 in cash, which he had brought with him from Charlotte and which was to be the cash portion of defendant's fee. After this Altman and the defendant went to O'Hare Airport in Chicago, where the defendant purchased from Eastern Air Lines two tickets for a return trip by the two of them on the 6:40 p. m. Eastern flight to Charlotte, it being understood that the loan would be completed and that Altman would receive its proceeds in cash and by bank transfer before that time. Altman testified that, after they had reached the airport, he was instructed by the defendant to stand by a door at the airport and to wait for some gentlemen in a Cadillac car who would deliver to him the $250,000 to be received by him in cash under the expected loan. The defendant at this point excused himself to make a phone call and, when Altman turned his back, the defendant disappeared with the $50,000. Needless to say, no one arrived in a Cadillac automobile bearing the agreed $250,000. In the meantime, the defendant, without the knowledge of Altman, had, according to the Government, changed his flight from the 6:40 o'clock flight to an earlier 2:50 o'clock flight but did not change Altman's reservation on the 6:40 flight. When Altman proceeded to inquire later at the Eastern Air Line's desk about the defendant he was informed, according to his testimony, that the defendant had departed.

On cross-examination Altman gave a somewhat different account of the transactions at the airport during which the $50,-000 cash fee was obtained by the defendant. Under this version Altman and the defendant were at the airport with the $50,000 still in the suitcase under the control of Altman. When, however, Altman's attention was directed elsewhere momentarily, the defendant grabbed the suitcase and disappeared with the money. The police authorities were called. Apparently, a check by the police authorities in both Chicago

and Charlotte was made of passengers on the two flights on which the defendant had purchased tickets and of passengers alighting in Charlotte from such flights in an attempt to apprehend the defendant. The defendant was not observed among those either boarding the flight in Chicago or disembarking in Charlotte. Neither was there any proof that the ticket purchased by the defendant in his name had been used.

In order to support Altman's version of events, the Government introduced into evidence, over objections, certain First Union National Bank of Charlotte wrappers, stamped by the tellers with their identification numbers, found as a result of a search of a room occupied by the defendant in San Diego, California. It also introduced into evidence certain materials taken by members of the Sheriff's Department of Imperial County, California, in the course of a search of two locked briefcases belonging to the defendant. Included in this material were various loan applications received by the defendant from persons other than Altman. The Government also offered evidence of another proposed loan transaction where the defendant operating again under an assumed name (but not the one used by him in his dealings with Altman) had bilked a person other than Altman by the use of the same procedure as used in this case.[1]

It is the defendant's position on this appeal that the district court erred (1) in not suppressing the evidence procured in the search of his room in San Diego and in the search of his briefcases, (2) in admitting evidence of other loan transactions of the defendant, (3) in permitting improper jury argument by the district attorney, and (4) in failing to grant his motion for acquittal on the charge under § 2314. We find error in the failure of the district court to suppress the evidence obtained as a result of the two searches and in the failure to dismiss the count charging a violation of

§ 2314; but we perceive no error in the admission of evidence of other loan transactions participated in by the defendant or in the argument of the district attorney. We accordingly remand the action to the district court for a retrial of the "fraud by wire" counts of the indictment.

We first address the validity of the search of the defendant's apartment in San Diego. This search, conducted some weeks after the theft alleged in the indictment, resulted from the concern of the defendant's landlady for the defendant's safety because she had not seen him for some time and had detected an unusual odor emanating from the apartment she had earlier rented him.[2] She requested the local police authorities to investigate the situation. When the officer responded to her request, she unlocked the door to defendant's apartment for him. The officer, on entering the apartment, found the defendant lying immobile on his bed covered with blood which he had apparently vomited. Upon examining the defendant the officer ascertained that he was alive, but concluded he was ill or drunk, or both, since he bore no evidence of having been shot or injured in any way. An ambulance was called to take the defendant to a hospital. While waiting for the ambulance, the officer noted some damage above the doorjam which appeared to have been caused by a buckshot. He inquired of the defendant where the shotgun was and was told it was under the bed. The officer looked under the bed, but found no shotgun.

After the defendant was taken to the hospital the officer made an exhaustive search of the entire apartment, looking, as he stated initially, for a shotgun, though subsequently he explained he was looking for a .25 caliber pistol. The officer justified his subsequent interest in a pistol by the discovery in the course of the search of a .25 caliber automatic pistol round on the floor

---

1. The Government offered other evidence but such testimony is irrelevant to the issues posed by the appellant's appeal.

2. The apartment consisted of a living room, one bedroom, a clothes-food closet, small kitchen, and a bathroom.

in the bedroom carpeting.[3] The officer, though, found neither a shotgun nor a pistol in his search. He did, however, find in his search a black plastic box, the dimensions of which were 2 × 4 × 6 inches. He stated he opened and examined it because it could possibly have held a .25 caliber pistol. In this box the officer found no pistol but did discover money wrappers with bank identification of FUNB on them. It was these wrappers which were admitted in evidence over defendant's objection and in denial of his earlier motion to suppress. This was error.

In our opinion, *Mincey v. Arizona* (1978), 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290, is dispositive of the invalidity of this search. In that case, an undercover police officer, backed up by a group of other officers, sought to complete a narcotics purchase at the defendant's apartment preparatory to a prearranged plan to consummate a "buy-bust."[4] When the undercover officer appeared at the apartment one of those present in the apartment with the defendant espied the accompanying officers and endeavored to prevent the undercover officer from entering the apartment. However, the undercover officer pressed his way in and encountered the defendant in a bedroom. Both the officer and the defendant began to fire, emptying their revolvers at each other. In the meantime, the other officers who had accompanied the undercover agent, had forced their way into the apartment and had overcome those present in the apartment. The undercover officer, however, was killed, and the defendant was severely wounded in the gunfire exchange between them. The defendant was removed to the hospital in a serious condition and the other occupants were arrested and taken into custody. A few minutes later, members of the police homicide squad arrived at the scene and began their own investigation. In the course of this investigation, a general, intensive, warrantless search of the apartment was made and considerable evidence of crime seized.

The issue in *Mincey* was the constitutional validity of the warrantless search of the defendant's apartment and the admissibility of the evidence seized as a result. The state court sustained the search on the theory that as a prompt "murder scene" investigation, it fell within a recognized exception to the Fourth Amendment standards governing warrantless searches. On appeal, the Supreme Court reversed. In reversal, Justice Stewart, speaking for the Court, began by reaffirming the principle stated in *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, that a "[s]earch conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" 437 U.S. at 390, 98 S.Ct. at 2408. The opinion recognized, however, that within such exceptions were certain emergency situations. It proceeded to identify as such exceptions to the warrant requirement of the Fourth Amendment "entries and searches [of an apartment or dwelling] when they [the officers] reasonably believe that a person within is in need of immediate aid" or "a prompt warrantless search of the area [whether in a house or apartment] to see if there are other victims or if a killer is still on the premises" in those instances where "the police come upon the scene of a homicide."[5] And while the police officers, "may seize any evidence that is in plain view during the course of [these] legitimate emergency activities," the Court declared that the officers may not under any so-called "murder scene exception" or otherwise conduct an intensive general search of the premises entered, and accordingly ruled that the evidence procured as a result of the general search in that case should be sup-

---

**3.** The record is not clear as to where in the carpeting the pistol round was found.

**4.** *State v. Morrisey* (1977), 115 Ariz. 472, 566 P.2d 273, 276 n. 1.

**5.** *See Sallie v. State of N. C.* (4th Cir. 1978), 587 F.2d 636, 641; *Root v. Gauper* (8th Cir. 1971), 438 F.2d 361, 364; *United States v. Barone* (2d Cir. 1964), 330 F.2d 543, 545, *cert. denied*, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053.

pressed. 437 U.S., at 392 and 393, 98 S.Ct., at 2414.

██ It may be accepted that *Mincey* supports the entry of the officers into the apartment in this case for the purpose of determining whether one was "within . . . in need of immediate aid." To this the defendant agrees. Having lawfully entered, the officers could have seized any evidence of crime "in plain view." Again, *Mincey* would authorize such a seizure. But when the officers proceeded to make a general search of the defendant's entire apartment, they engaged upon an unlawful search, just as the officers did in *Mincey*, and any evidence seized as a consequence was inadmissible. In fact, the circumstances in favor of a legitimate search at that point were substantially weaker than those in *Mincey*. In *Mincey*, the apartment the investigating officers searched was actually the scene of a recent murder; in this case, no crime, certainly no murder, had been committed in the apartment nor were the officers engaged in investigating a crime. The officers had no knowledge or even information that the defendant had committed any crime. The defendant was the sole occupant of the apartment. He had not been shot nor did he have on him evidence of even bruises. The only justification assigned by the police officers for a general search was their observation of what appeared to be a buckshot in a wall. There was no suggestion in the record that it appeared to be a recent shot. Certainly, there was no evidence whatsoever that anyone had been recently shot in the apartment. To repeat: Unlike the officers in *Mincey*, the officers here had no reason to assume that a murder had been committed in the apartment. Nor was there any emergency justifying an immediate warrantless search because of likely loss of evidence of a crime, first, because there was no evidence of a crime and, second, because the defendant, the renter of the apartment and its sole occupant, had been transported to a hospital in a semi-conscious state. If the search

in *Mincey* could not be justified on its facts, clearly the search here must be held to have been violative of the Fourth Amendment proscription, and this is particularly so, since—again unlike the situation in *Mincey* —the facts here would not have actually been sufficient to support a warrant to search.

██ There is an additional ground supporting the suppression in this case. It may be true that if an officer, in the course of a legal warrantless search, comes upon a suspicious object in plain view, he is entitled to inspect it, and, if it includes evidence of a crime, though not of the crime being investigated, he may seize it. *See Harris v. United States* (1947), 331 U.S. 145, 154–55, 67 S.Ct. 1527, 91 L.Ed. 1871. But this rule is not an unlimited right extending "to the interiors of every discrete enclosed space capable of search within the area," *United States v. Block* (4th Cir. 1978), 590 F.2d 535, 541, but is one which is "legitimate only where it is immediately apparent to the police that they have evidence [of an incriminating nature] before them." *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564; *United States v. Berenguer* (2d Cir. 1977), 562 F.2d 206, 210.

A perusal of the plastic box and its contents in this case would not have suggested to the officer that the contents were of an incriminating nature, since apparently the San Diego officers had no knowledge of any unlawful conduct by the defendant. It will not do that the officers might later have learned of the Altman transaction and the relevance to that transaction of the material found in the box. While the requirement of "immediately apparent" is not so rigid as to deny the right to make some brief perusal or examination of the material in order to perceive its relevancy,[6] the requirement cannot be extended to encompass a situation, such as here, where a brief perusal of the article would not have suggested to the officers its incriminatory nature.

---

6. *See United States v. Ochs* (2d Cir. 1979), 595 F.2d 1247, 1257 n. 8; *Mapp v. Warden* (2d Cir.

1976), 531 F.2d 1167, 1172, *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592.

However the search of the plastic box may be viewed, it cannot be constitutionally justified and the fruits of such unlawful search were not admissible in evidence. The district court accordingly erred in denying the motion to suppress and in admitting the bank wrappers in evidence.

■ The second search challenged by the defendant as constitutionally invalid involved a search by the officers of the Imperial County (California) Sheriff's Department of certain briefcases left by the defendant for safekeeping with his friend Houghton. The briefcases in question were three in number, only two of which were securely locked. The challenge by the defendant relates to the two locked briefcases, since it was the evidence found in the locked briefcases which the Government offered in evidence and to the admissibility of which the defendant objected. In these two locked briefcases were an assortment of personal records of the defendant, including certain information relating to other loan applications presumably solicited by the defendant in the same manner as that of Altman had been solicited. The search of these briefcases by the officers followed the arrest of Houghton on a number of traffic violation warrants. After he had been arrested, the officers inquired of Houghton about an alleged FBI badge, an ID card, and certain guns, stated at one time to be "a hand gun" and at another time as "sawed-off shotguns." Houghton readily admitted the existence of an investigator's badge, an ID card, and certain guns, but denied ownership of any of them. He told the officers the investigator's badge and the ID card, in particular, were in certain briefcases which had been given him for safekeeping by the defendant. He proceeded to inform the officers that the briefcases and the guns were at the home of one Kozlowski, with whom he had left them for safekeeping. Houghton telephoned Kozlowski in the presence of the officers and told the latter to let the officers see the articles he had left with him.

An officer from the Imperial County Sheriff's office went to Kozlowski's home. Kozlowski told him that he knew why he was there, that he had received a telephone call from Houghton that he was coming. He turned over to the officer three sawed-off shotguns and three briefcases. He told the officer that so far as he knew these weapons belonged to an F.B.I. agent and that he was holding them for his friend Houghton. The officer took the shotguns and the briefcases to the Sheriff's office, and, despite knowledge that Houghton denied any ownership in the briefcases, the officer, in the presence of other investigators, first opened the unlocked briefcase and found therein the investigator's badge and ID card for which he was looking. Although the officers had thus secured the articles which they sought, they continued their search by breaking the lock or by forcing the combination on the two locked briefcases of the defendant. As we have already stated, the defendant objects, on the ground that the search was invalid, to the admission of the private papers discovered as a result of the search of these two locked briefcases.

In our opinion *United States v. Chadwick* (1977), 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538, and *Arkansas v. Sanders* (1979), —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235, extend the prohibition of the Fourth Amendment against warrantless searches to personal luggage, including locked suitcases or briefcases. The search involved in *Chadwick* concerned both a footlocker and suitcases. The circuit court opinion under review had found invalid the warrantless search of both the footlocker and the suitcases. *United States v. Chadwick* (1st Cir. 1976), 532 F.2d 773, 782–83. The Government did not appeal the invalidation of the search of the suitcases and limited its appeal to the validity of the search of the footlocker. The language of the opinion of the Supreme Court was, however, sufficiently definite to impart invalidity to the warrantless search of both the suitcases and the footlocker. That this was the proper construction of the breadth of the opinion was made clear by the action of the Supreme Court in the subsequent decision in *United States v. Schleis* (8th Cir. 1976), 543

F.2d 59. In that case, the circuit court had found valid a warrantless search of a locked briefcase incident to an arrest. The Supreme Court, on appeal, vacated the decision of the circuit court, and remanded "for further consideration in light of *United States v. Chadwick,*" 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed. 1089. On remand, the circuit court construed the remand as a direction that, barring exigent circumstances, a warrantless search of a locked briefcase was invalid as a violation of a party's reasonable expectation of privacy. *United States v. Schleis* (8th Cir. 1978), 582 F.2d 1166.

The construction of *Chadwick,* as applied in *Schleis* to a briefcase, was in effect confirmed by the Supreme Court in the recent case of *Arkansas v. Sanders, supra,* involving the warrantless search of a suitcase seized by the police in connection with a search of an automobile. The Court found *Chadwick* applicable. It recognized that in *Chadwick* search of a footlocker was in issue and in *Sanders* search of a suitcase, but it declared, "We do not view the difference in the sizes of the footlocker and suitcase as material here; nor did respondent's failure to lock his suitcase alter its fundamental character as a repository for personal, private effects." —— U.S. at —— n. 9, 99 S.Ct. at 2592 n. 9. Actually, there seems to have been general agreement in this case that a warrantless search of a seized suitcase was invalid; the question was whether the fact that the suitcase was in an automobile worked a difference in the applicable principles. The Court, after observing that "luggage is a common repository for one's personal effects, and therefore is inevitably associated with the expectation of privacy," held "that the warrant requirement of the Fourth Amendment applies to personal luggage taken from an automobile to the same degree it applies to such luggage in other locations." *Id.* at ——, ——, ——, 99

S.Ct. at 2592, 2594.[7] This the most recent expression by the Supreme Court on the issue would appear to confirm the invalidity of the search of the briefcases in this case.[8]

■ The Government argues that Houghton's possession of the briefcases, even though only for safekeeping, rendered his consent proper authorization for a valid search of the briefcases by the officers. There can be little question of the validity of a consent to search by one who has "common authority over, general access to, or mutual use of the place or object sought to be inspected," but it is equally well settled that

> third person consent, no matter how voluntarily and unambiguously given, cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source; nor even more certainly, when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person; nor, still more certainly, when the retained expectation of privacy is manifest in the circumstances and the third person actually disclaims any right of access.

*United States v. Block* (4th Cir. 1978), 590 F.2d 535, 539–40 (citations omitted).

There can be no question that in this case the defendant clearly manifested that expectation of privacy in the two locked briefcases which entitled him to the protection guaranteed by the Fourth Amendment and that Houghton claimed no right of access to the locked briefcases. *Cf. United States v. Chadwick,* 433 U.S. at 11, 97 S.Ct. 2476. The very act of locking them and retaining either the key or the combination to the

---

**7.** This holding would seem to make invalid the basis on which the Court in *United States v. Ochs* (2d Cir. 1979), 595 F.2d 1247, 1254–55, found a search of a briefcase in the course of a valid automobile search not to be a violation of the Fourth Amendment.

**8.** This case is distinguishable from *United States v. Garcia* (7th Cir. 1979), 605 F.2d 349, where the issue was the right to search a suitcase as an incident to a lawful arrest. This was not claimed as a legal basis for the search in this case. It is also doubtful that *Garcia* can be reconciled with *Sanders.*

locks on the two briefcases was an effective expression of the defendant's expectation of privacy. Nor can it be said that there was any suggestion that Houghton was given by the defendant any right of "general access" or of "mutual use" of the briefcases; the defendant's failure to give Houghton a key or combination to the locks was the clearest evidence that there was no intention on the defendant's part to give Houghton or anyone asserting under him "access" to the locked briefcases. Nor, as we have said, did Houghton claim any right of access. Houghton's connection with the briefcases was very clearly delineated in the record. By his own account, he received the briefcases solely for safekeeping. Such possession gave him no "common authority" over the contents of the locked briefcases and vested in him no power to consent to their search. And this was well known to the officers, for, as they admitted, Houghton told them the briefcases were not his but the defendant's, that he (Houghton) was merely entrusted with them for safekeeping, and that he had no key or combination to the locks on or right of access to the two locked briefcases.

The appellee, as well as the district court, relied on *United States v. Peterson* (4th Cir. 1975), 524 F.2d 167, *cert. denied* (1976), 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99, as authority for the proposition that consent by Houghton validated the search. This case, however, is quite different from *Peterson*. There a mother, who owned the house in which her family lived, consented to the search of a room in the house, shared by the defendant, a son, with his two brothers. There was no landlord-tenant relationship between the mother and the defendant-son, who was "a mere guest occupant of the room in his mother's home." *Cf. United States v. Block,* 590 F.2d at 541. It was never contended "that the mother had relinquished her control of the room or her ability to designate what use, if any, could be made of that room by Peterson [the defendant]." 524 F.2d at 179. The property searched in that case was the mother's, and the mother concededly had absolute control of the property searched and the

power to control its use. Moreover, there was every reason for the officers to assume that the mother in possession had the right to consent to the search. That is not at all like a case such as this in which the person whose consent is relied on for the search did not have any interest in or right of access to the property searched and so advised the officers of that fact before the search.

■ Nor could it be said that there were any exigent circumstances which could justify a warrantless search in this case. The officers had actual possession of the briefcases. The defendant was absent. There was no danger that the briefcases would disappear or that the defendant, lying in a hospital in a semi-conscious state, would attempt to destroy any papers in the briefcases. When the briefcases came "under the exclusive dominion of police authority," the defendant was "entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before [his] privacy interests in the contents of the [briefcases] were invaded." *See United States v. Chadwick,* 423 U.S. at 15–16, 97 S.Ct. 2476. And the district court erred in failing to give him that protection.

■ The defendant also assails his conviction under the § 2314 count of the indictment (*i. e.,* transportation of property worth more than $5,000 which had been fraudulently obtained). Transportation in interstate commerce of the fraudulently obtained property is an essential element of the offense under the statute. The Government seeks to satisfy this requirement by contending that there is sufficient circumstantial evidence that the defendant transported the $50,000 alleged to have been fraudulently obtained from Altman from Chicago, Illinois, to Charlotte, North Carolina, via Eastern Air Lines on March 30, 1978. The only evidence to support this contention is the fact that the defendant purchased an airline ticket for use, initially, on an Eastern Air Lines flight from Chicago, Illinois, to Charlotte, North Carolina, scheduled to leave at 6:40 p. m. on March 30, 1978, which ticket he later changed to a

flight leaving at 2:50 p. m. No one, however, saw the defendant board either the 2:50 or the 6:40 flight. There was no evidence that the ticket for use by him for the trip from Chicago to Charlotte was ever used. No one testified that the defendant was ever seen in Charlotte on or after March 30, 1978. Actually, when next heard of, the defendant was in San Diego, California. If the wrappers found in the plastic box during the illegal search of the defendant's apartment in San Diego are disregarded, there is no evidence that the defendant carried any of the money allegedly taken from Altman away from Chicago. The single circumstance on which the Government relies for proof is the statement of the employee who changed his ticket from the 6:40 flight to the 2:50 flight. She, however, never saw the defendant embark nor is there any evidence, as we have said, that the defendant ever used his ticket. The Government accordingly failed to offer sufficient evidence, either direct or circumstantial, of the essential element of interstate transportation to support the conviction under count six of the indictment, charging a violation of § 2314, 18 U.S.C.

We have reviewed the other claims of error and find them without merit. The evidence of similar transactions was admissible on the issue of intent and motive. *See United States v. Baldivid* (4th Cir. 1972), 465 F.2d 1277, 1281–82, *cert. denied,* 409 U.S. 1047, 93 S.Ct. 519, 34 L.Ed.2d 499. The prosecutor's jury argument, which the defendant faults, was not objected to at trial and we find no improper limitation by the district court upon the defendant's right of cross-examination of Altman.

The cause is accordingly remanded to the district court with directions to vacate the judgment of conviction of the defendant under the sixth count of the indictment alleging violation of § 2314, 18 U.S.C., and for retrial of the counts charging violation of § 1343, 18 U.S.C. At retrial, the district court should suppress for use as evidence anything obtained as a result of the search of defendant's apartment and of his two locked briefcases.

*REVERSED* and *REMANDED FOR NEW TRIAL.*