UNITED STATES of America

v.

**William Randal CORBIN, Wesley Warren Corbin, Michael Anthony Adkins, Sue Higginbotham Eller, Simeon M. Chavis, also known as Buck.**

Nos. CR–80–65–01–G to CR–80–65–05–G.

United States District Court,
M. D. North Carolina,
Greensboro Division.

July 23, 1980.

David B. Smith, Asst. U. S. Atty., Greensboro, N. C., for United States; H. M. Michaux, Jr., U. S. Atty., Greensboro, N. C., of counsel.

Roger V. Rigau, Tampa, Fla., for defendant William Randal Corbin; Wright, Parrish & Fraser, Winston-Salem, N. C., of counsel.

Alan S. Ross, Miami, Fla., for defendants Wesley Warren Corbin and Sue Higginbotham Eller; Joseph B. Cheshire V, Raleigh, N. C., of counsel.

## MEMORANDUM ORDER

GORDON, Chief Judge.

On July 9, 10, and 11, 1980, a hearing was held to determine several motions made by the defendants Wesley Corbin and Sue H. Eller, and by the defendant William Randal Corbin. Having heard direct and cross-examination of witnesses, oral argument by counsel, and having considered the defendants' and the Government's briefs, the Court concludes that with respect to the motion to suppress items of evidence seized in Room 442 of the Holiday Inn-Airport near Greensboro, North Carolina

(1) the .22 caliber revolver (derringer) will not be suppressed;

(2) the statements of Sue Eller to Agent Odis Rousseau acknowledging ownership of the gun will be suppressed; and

(3) the contents of the purse of Sue Eller will be suppressed.

Essential findings of fact are incorporated in the discussion of applicable law set forth below.

On the evening of May 20, 1980, approximately 12–15 law enforcement agents were in the immediate vicinity of the Holiday Inn-Airport. Michael Adkins had arranged a large sale of 100,000 Quaaludes to Special Agent Robert Clark, to take place in Room 440 of the Inn. Adkins had made several phone calls to Clark during the course of the day on the 20th, and Clark was aware that others were accompanying Adkins and that these others were in Room 442, which adjoined Room 440 by connecting doors. Clark had been instructed by Adkins to call 442 before coming to 440. Adkins had indicated that the others with him (unidentified by name, number of persons, or sex by Adkins, but known to the agents to be two men and a woman) did not want to see the buyer (Clark), but were there for the protection of the seller (Adkins). When Clark and another undercover agent, Odis Rousseau, entered Room 440, Adkins was the only occupant of that room. The connecting door to Room 442 was not completely shut. After four suitcases of Quaaludes were opened for inspection by the purported buyers, Clark then alerted the other agents in the vicinity by means of a pre-arranged telephone signal. Shortly thereafter, agents entered Room 440 from the hallway and arrested Adkins. Agent Rousseau and some of the agents (a probable total of five agents) entered Room 442 through the connecting doors, and arrested Wesley Corbin, Sue H. Eller, and William Randal Corbin.

It is apparent that the events immediately surrounding the arrest of these four defendants on May 20 are shrouded in some confusion. This confusion is not surprising in light of the circumstances. The agents were concerned with arresting several persons they had reason to believe were involved in the large scale distribution of Quaaludes, a serious crime. They had reason to believe that some or all of the persons in Room 442 would be armed. They were concerned with protecting what they had reason to believe were 100,000 Quaalude tablets, and they were also concerned with the protection of a $112,000.00 "flash roll" used by Agents Clark and Rousseau for the purported purchase of the Quaaludes. There were 12–15 agents on the scene and four suspects. It is the Court's task, however, to make essential findings of fact from which conclusions of law can be drawn.

When the agents entered the connecting door to Room 442, Sue Eller and Wesley Corbin were lying on the bed nearest the door to the hallway with an ashtray between them. William Randal Corbin was on the other bed. As the agents entered, shouting their status as law enforcement officers and the fact of the occupants' arrest, Sue Eller stood. The agents had their guns drawn. Wesley Corbin remained lying on the bed until one of the agents grabbed his hand. At that point, there was a minor scuffle with Wesley and one or more of the agents until he was subdued and placed in handcuffs. William Randal Corbin was placed in handcuffs, too, and neither Wesley nor William Randal were armed or found to possess any weapon. Agent Rousseau approached Sue Eller as she arose

from the bed. There was an object at her feet—the .22 caliber revolver. Agent Rousseau thereupon inquired of Sue either what the object was or who owned it; that is, he either said, "Is this yours?", or he said "What's this?". Sue Eller replied that it was hers and had come from her purse. No *Miranda* warnings were given prior to this exchange between Rousseau and Eller.

■ The agents were lawfully within Room 442. It would have been an outrageous breach of common sense not to enter Room 442, when the agents had information from which it was reasonable to assume that armed confederates of the man who was to sell them 100,000 Quaaludes were within that room. The Court does not find the discrepancy in the testimony concerning whether the connecting door was shut, open, or ajar to be significant. Under the circumstances, the agents were justified in their "protective sweep" of the room adjoining Room 440. *United States v. Baker*, 577 F.2d 1147, 1152 (4th Cir.), *cert. denied*, 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978).

Based upon the agents' lawful presence in Room 442, the seizure of the .22 caliber revolver was proper under the "plain view" doctrine. *Coolidge v. New Hampshire*, 403 U.S. 443, 465–67, 91 S.Ct. 2022, 2037–2039, 29 L.Ed.2d 564 (1971); *United States v. Phillips*, 593 F.2d 553, 556 (4th Cir. 1978), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2169, 60 L.Ed.2d 1050 (1979).

■ Sue Eller's statements regarding ownership of the gun will be suppressed, however. Agent Rousseau's question falls squarely within the category of "custodial interrogation." Five armed agents were in the room and in the process of subduing and placing handcuffs on the occupants. (Sue Eller was herself handcuffed either during or shortly after the exchange with Agent Rousseau.) The occupants were told that they were under arrest. It is clear that none of the three would have been allowed to leave. The Government concedes the fact of custody, but argues that Agent Rousseau's question was not "interrogation." This argument is without merit.

The recent Supreme Court case *Rhode Island v. Innis*, —— U.S. ——, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) is a reaffirmation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Innis* defines "interrogation" as referring *"not only to express questioning*, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response [5] from the suspect." *Innis, supra,* —— U.S. at ——, 100 S.Ct. at 1689 (emphasis added). Footnote 5 of the opinion states: "By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." (Emphasis in original.) The direct question put to Sue Eller was "interrogation," and because her response and the question came before the warnings about self-incrimination required by the Supreme Court of the United States for the past fourteen years, her answer may not be introduced at the trial of this action.

■ Sometime after the three occupants of Room 442 were handcuffed, Agent Bob Ingram picked up Sue Eller's purse from the bed where she and Wesley had been reclining when the agents entered the room. Agent Ingram searched the purse. Inside a rolled-over cigarette pack found inside the purse, he found what proved to be 13 Quaaludes and one "PCE" pill. ("PCE" is a Schedule I controlled substance.) Agent Ingram gave as a reason for searching the purse that he was conducting a quasi-inventory in case the defendant Eller should later claim that the agents had stolen something of value from the purse. He did not, however, make a list of the purse's contents. He placed the cigarette pack containing the various pills back in the purse, and the contents were later removed at DEA headquarters in Greensboro and sent to Washington for evaluation. The purse was not fastened shut. It was a leather bag with a foldover flap. The flap may or may not have been folded over. There is no suggestion that Agent Ingram could see the contents of the purse before

he searched it, though, and this is true *a fortiori* of the pills sought to be suppressed since they were within a Kool cigarette pack (the Court notes that the package is non-transparent) within the purse. The *Coolidge v. New Hampshire* "plain view" doctrine is thus inapplicable, for it was not immediately apparent to the agents that the contents of the purse included incriminating evidence. 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

Last term the Supreme Court reiterated that a warrant is a prerequisite for a search, with but a few "jealously and carefully drawn" exceptions. *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979). *Sanders* held that when "the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained." *Id.* at 766, 99 S.Ct. at 2594. *Sanders* reaffirmed the existence of an "automobile exception" to the warrant requirement, but made clear that luggage which could be removed from an automobile and secured by the police pending application for a warrant was not in the same category as the automobile itself. In *Sanders*, Mr. Justice Powell classified *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1978) and *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) as "automobile exception" cases, rather than "inventory" cases. 442 U.S. at 761, 763, 99 S.Ct. at 2591, 2592.

■ *Sanders*, involving an unlocked suitcase, thus became the logical extension of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), which held that a locked footlocker could not be searched lawfully without a warrant. *Sanders* concededly did not involve any exigent circumstances. "With the police in control of the automobile and its occupants, there was no danger that the suitcase and its contents would be rendered unavailable to due legal process." 442 U.S. at 756, 99 S.Ct. at 2589. The Court also was not con-

sidering the constitutionality of searches of luggage incident to an arrest, for the state did not contend that the search was incident to an arrest. *Id.* at 764 n.11, 99 S.Ct. at 2593 n.11. Footnote 11 goes on to say that the "bag was not within [the defendant's] 'immediate control' at the time of the search," however. In the instant case, it is difficult to discern any exigent circumstances. Footnote 11 states that generally "such exigencies will depend upon the probable contents of the luggage and the suspect's access to those contents." None of the defendants had any access to the purse at the time of the search. All were handcuffed, and they were outnumbered by the agents at least 3 to 1. Thus two of the prime reasons for warrantless searches are not present in this case: considerations of the officers' safety (and concomitantly, access to weapons for later escape), and considerations of the possible destruction of evidence. It was simply not possible for the defendants to get into the purse.

*United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), held that a full search of the person in the case of a lawful custodial arrest was a reasonable search under the Fourth Amendment. The search of Eller's purse, however, was not the search of Eller's person. The argument that it amounts to a search of her person because women carry in purses what men carry in pockets is specious. The justification for searches incident to arrest is based upon the need to disarm and to discover evidence, and the Supreme Court has said that insofar as searches of the person go, it will not require a case-by-case decision on the probability of whether weapons or evidence would in fact be found on the arrestee. 414 U.S. at 235, 94 S.Ct. at 476. *Robinson* did not disturb the holding of *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), that there is no constitutional justification for searching beyond the area from which the arrestee might obtain either a weapon or something that could be used as evidence against him or her.

The Court is of the opinion that the rationale of *Chadwick* (locked footlocker) and *Sanders* (unlocked suitcase) can be applied to a woman's purse, even though that purse is not fastened completely. As Judge Phillips has stated:

"Common experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's 'enclosed spaces'—mankind's valises, suitcases, footlockers, strong boxes, etc.—are frequently the objects of his highest privacy expectations, and that the expectations may well be at their most intense when such effects are deposited temporarily or kept semi-permanently in public places or in places under the general control of another." *United States v. Block*, 590 F.2d 535, 541 (4th Cir. 1978).

It is among the teachings of the "common experience of life" that womankind's purses are the objects of her highest privacy expectations. A purse is a repository for personal articles of toiletry and hygiene, for photos and keepsakes, for money and necessary items of identification such as driver's licenses, and for items as diverse as women are diverse. There are very few, and perhaps no, women who would willingly suffer strangers to rummage about one's purse. There are scarcely more who would willingly allow anyone, even a spouse or loved one, to search through one's purse. The Court therefore concludes that Sue Eller's purse, even though it may not have been fastened, should have been afforded the protection of the Fourth Amendment.

A recent case in this Circuit which applied *Sanders* extended the protection afforded suitcases by Sanders to brief cases.[1] *United States v. Presler*, 610 F.2d 1206 (4th Cir. 1979). The Court of Appeals had this to say in regard to the absence of exigent circumstances:

"The officers had actual possession of the briefcases. The defendant was absent. There was no danger that the briefcases would disappear or that the defendant, lying in a hospital in a semi-conscious state, would attempt to destroy any papers in the briefcases. When the briefcases came 'under the exclusive dominion of police authority,' the defendant was 'entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before [his] privacy interests in the contents of the [briefcases] were invaded.'" 610 F.2d at 1214 (brackets in original; citations omitted).

*See United States v. Meier*, 602 F.2d 253, 255 (10th Cir. 1979) (extending *Sanders* to back packs); *State v. Cole*, 46 N.C.App. 592, 265 S.E.2d 507 (1980) (extending *Sanders* to heavy coat found in car trunk). Sue Eller had as little chance of access to the purse in the instant case as did Presler lying in his hospital bed. The contents of the purse will be suppressed.[2]

---

**1.** Judge Russell, writing for the Court of Appeals, noted that it is doubtful whether *United States v. Garcia*, 605 F.2d 349 (7th Cir. 1979), the most recent case cited by the Government in support of admitting the contents of the purse, can be reconciled with *Sanders*. 610 F.2d at 1213 n.8. Moreover, Judge Russell pointed out that in *Sanders*, it was generally agreed that the search of the suitcase was invalid unless it could be validated under the "automobile exception." *Id.* at 1213.

**2.** This Court does not decide whether a purse in the hands of, or over the shoulder of, an arrestee may be searched incident to a lawful arrest. The basis of the decision today is the "immedi-

ate control" doctrine of *Chimel* and its progeny. Nor does this case involve circumstances where the officers had reasonable cause to believe that the purse contained evidence of the crime at issue. The agent's stated reason for searching the purse was so that he could not be accused later of stealing its contents. This reason, in the circumstances as presented to the Court, is not found as an exception to the warrant requirement in Fourth Amendment jurisprudence. Nor is it reasonable to assume that part of the cache of 100,000 Quaaludes, contained in four suitcases, would be found in Sue Eller's purse; and no such suggestion was made by the agents.