UNITED STATES of America, Appellant,

v.

Garrett James BARRY and Faith Annette Long, Appellees.

No. 87–5147.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1987.

Decided Aug. 12, 1988.

**1480**

Jon M. Hopeman, Asst. U.S. Atty., Minneapolis, Minn., for appellant.

Bruce H. Hanley and John W. Lundquist, Minneapolis, Minn., for appellees.

Before LAY, Chief Judge, and HEANEY and MAGILL, Circuit Judges.

HEANEY, Circuit Judge.

The United States appeals the district court's order suppressing evidence seized during a warrantless search of a suitcase recovered from an airport Tele–Ticket Computer Check counter. We find that the defendant, Garrett James Barry, had a personal and reasonable expectation of privacy in the contents of the suitcase. Thus, Barry had standing to assert a fourth amendment violation, and a warrant was required before the search could take place. Moreover, we believe that circumstances surrounding the search of the suitcase were not sufficiently exigent to dispense with the necessity of obtaining a warrant. We thus affirm the decision of the district court.

I. *Facts*

The Federal Bureau of Investigation (FBI) began investigating thefts of airline tickets from travel agencies in the Minneapolis, Minnesota area. Arlene Anderson, a former business associate of Barry, contacted the FBI and told agents Barry was interested in selling stolen airline tickets. Agents of the FBI, using Anderson as a "go-between," began purchasing airline tickets from Barry in early 1986.

After several preliminary purchases, at a meeting on August 7, 1986, Anderson discussed with defendants Barry and Faith Annette Long a large "buy" of airline tickets. They agreed that the sale would take place on October 9, 1986, at the Hyatt Regency Hotel and that Anderson would pay $43,000 for the tickets.

In order to assure Anderson that the tickets actually existed, on the morning of October 9, 1986, Barry took her to the Ridgedale shopping mall where he showed her approximately 100 airline tickets in a locker. Then, according to prior arrangements, Anderson went to a Holiday Inn across from the Hyatt and obtained the purchase money from her buyer (an undercover agent known to Barry as "G. Nelson"). Anderson, following pre-arranged plans, went to the Hyatt, entered an empty elevator, and pressed all the buttons. According to Barry's instructions, she would at some point see a person whom "she trusted" and was to give that person the money. Thereafter, Anderson was to go to a coffee shop where she would be contacted and told how to find the tickets.

Barry told Anderson she would be watched, and if she was followed, he would disappear. Consequently, the FBI "wired" Anderson, and surveillance agents located themselves in an elevator next to hers. She was directed to call the floor numbers into a secret transmitter as the elevator rose and indicate with a code word when the actual transaction took place. The FBI planned to arrest Barry when the money changed hands.

The elevator stopped at the second floor and Anderson was greeted by Barry. She gave him the money but forgot to signal the FBI agents that money had changed hands. As a result, Barry was able to escape without being arrested. With the $43,000 and the tickets in Barry's hands, the FBI frantically began to look for Barry, the money, and the tickets. Meanwhile, Anderson went to the coffee shop and waited to be contacted.

During this interval, the FBI first dispatched agents to the Ridgedale Mall area where Barry had shown Anderson tickets earlier that morning. There they found defendant Long and interrogated her without benefit of *Miranda*[1] warnings. Much

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

of her statement was later suppressed by the district court. During this encounter, Long opened locker # 403 at the mall and ten plane tickets were recovered. The agents then searched Long's car. Finding nothing, Long was released. Long thereafter went to an audition at MacPhail Center for the Arts.

Also, during this interim period, agents questioned two hotel security guards who reported seeing Barry on the sixth floor of the Hyatt talking to a woman with dark hair. One of the guards overheard Barry tell the woman that he would meet her at Shapiro's gift shop on the mezzanine of the hotel. Responding to this information, the FBI in an independent search near Shapiro's gift shop found a taped envelope under some wood chips in a planter. The envelope contained a key for locker # 260 at the Ridgedale shopping mall. In the corresponding locker was another key for an airport locker # 429 on the Blue Concourse. On opening the airport locker, the FBI found an envelope with the letter "A" on it. (A for Anderson, perhaps). In the envelope was another envelope with the name "G Nelson" (G. Nelson was the name being used by the undercover agent that was supposed to be buying the tickets.) In this second envelope there was a note that a third envelope containing a claim check could be found under the pay telephones next to the lockers. Nothing was found under the telephones. The agents then went to a nearby Tele–Ticket Computer Check and asked if there was a package for "G. Nelson." A brown locked suitcase was delivered to the FBI agents.

The suitcase was immediately x-rayed as a security precaution. The agents then proceeded to MacPhail Center for the Arts where they arrested Long. After interviewing Long for over an hour, they then forced open the suitcase without a warrant and found the stolen plane tickets.

In the meantime, Barry had called Anderson and told her to meet him at a nearby YMCA so that he could tell her where the tickets were. Before he could do anything, however, Barry was arrested by FBI agents. A subsequent search of Barry's van turned up a key for locker # 283 near the Green Concourse at the Minneapolis–St. Paul International Airport.

Several days later, after the warrantless search of the suitcase, the key found in the search of Barry's van was used to open locker # 283 at the airport. In this locker was an envelope which contained a claim check for the Tele–Ticket Computer Check and a key for the locked suitcase. The district court suppressed the information obtained from the locker search because the FBI had not obtained a warrant. The government did not contest this decision.

To this time, the significance of all these interrelated actions is not entirely clear. The government hypothesizes that if Barry was not interrupted by this arrest, he would have used the key to locker # 283 at the airport, removed the envelope and taped it under the phones nearby locker # 429 before Anderson arrived at the airport. This would appear likely.

## II. *Standing and Expectation of Privacy*

■ The government contends that the suppression of the contents of the seized briefcase was improper both because the defendant did not have standing to assert a violation of the fourth amendment and because he no longer retained an expectation of privacy. In many respects, these two issues coalesce, for the Supreme Court has declared that a defendant has standing to assert a violation of the fourth amendment when the conduct at issue involves an intrusion into a personal and reasonable expectation of privacy. *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *see also Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Because we find that the search of the suitcase involved such an intrusion, neither of the government's contentions is valid.

Clearly, Barry retained a personal and reasonable expectation of privacy in the locked suitcase. It is true that Barry intended to sell the plane tickets and had made preparations to transfer them to Anderson. Yet, the transaction was far from complete in Barry's mind. Barry had neither given the tickets to Anderson nor

indicated to her where they were. Next, at the time of his arrest, Barry held the key to airport locker #283. In this locker was the claim ticket to the suitcase and the key which would open it. By holding this key, Barry clearly demonstrated his intent to control the suitcase and its contents. Moreover, at the moment of his arrest, Barry still had available the realistic option to void the sale (for example, if he discovered any problem with payment or if he noticed that Anderson was under surveillance). Thus, Barry's expectation of privacy in the suitcase was preserved. The fact that the FBI had located the whereabouts of the locked suitcase is completely irrelevant in terms of Barry's expectation of privacy in its contents.

This position is supported by *United States v. Presler*, 610 F.2d 1206 (4th Cir. 1979). In this case, the defendant left two locked briefcases in the safekeeping of Houghton, a friend. Houghton later consented to the search of the briefcases and incriminating evidence was found. The court suppressed the evidence, stating:

> There can be no question that in this case the defendant clearly manifested that expectation of privacy in the two locked briefcases which entitled him to the protection guaranteed by the Fourth Amendment and that Houghton claimed no right of access to the locked briefcases. * * * The very act of locking them and retaining either the key or the combination to the locks on the two briefcases was an effective expression of the defendant's expectation of privacy. Nor can it be said that there was any suggestion that Houghton was given by the defendant any right of "general access" or of "mutual use" of the briefcases; the defendant's failure to give Houghton a key or combination to the locks was the clearest evidence that there was no intention on the defendant's part to give Houghton or anyone asserting under him "access" to the locked briefcases. Nor, as we have said, did Houghton claim any right of access. Houghton's connection with the briefcases was very clearly delineated in the record. By his own account, he received the briefcases solely for safekeeping. Such possession gave him no "common authority" over the contents of the locked briefcases and vested in him no power to consent to their search. And this was well known to the officers, for, as they admitted, Houghton told them the briefcases were not his but the defendant's, that he (Houghton) was merely entrusted with them for safekeeping, and that he had no key or combination to the locks on or right of access to the two locked briefcases.

*Id.* at 1213–14.

*Presler* thus demonstrates that Barry had a legitimate expectation of privacy in the suitcase. First, by locking the briefcase and retaining the keys, Barry, like Presler, "effective[ly] express[ed] [his] expectation of privacy." Second, like Presler, Barry did not provide any suggestion of a right of "general access" or "mutual use" to the Tele–Ticket Computer Check. Third, the Tele–Ticket Computer Check, like Houghton, received the briefcase "solely for safekeeping" with "no 'common authority' over the contents."

The dissent argues that, because the present case involved a delivery situation, it is distinguishable from *Presler*, which involved only safekeeping. However, at the time Barry was arrested, the transaction was far from completed. Barry, like Presler, retained not only a key to the suitcase but a claim check to recover it. Consequently, Barry, like Presler, had the potential to retrieve and control the contents of the suitcase. Given this, the task assigned to the Tele–Ticket Computer Check was also essentially a safekeeping function. The fact that at some future time, Barry may have wished to transfer the property to a third person has no relevance to his personal expectation of privacy at the moment the warrantless search was conducted. Moreover, it might naturally be assumed that a friend would have greater authority than a stranger to consent to the search of items placed in his care. Therefore, it would seem to follow that if Presler had not abandoned his expectation of privacy by placing the briefcases in the hands of a trusted friend for the limited

purpose of safekeeping that Barry had certainly not done so by placing his suitcase in the hands of strangers for this same purpose.

\* \* \* \* \* \*

The facts underlying this case are quite complex. The legal arguments advanced in support of the parties, however, range from Barry's very simple contentions to the complex analysis adopted by the dissent. Barry maintains that by withholding the location of the suitcase and the key and claim check from the potential purchaser, he retained control over the suitcase and hence had a reasonable expectation of privacy in its contents.

The dissent counters by arguing that, although Barry had not told the intended recipient of the suitcase where it could be found and retained the key and claim ticket to the suitcase, he had lost his reasonable expectation of privacy in the suitcase because he had somehow "abandoned" it.

Judge Magill writes:

[Barry] left the suitcase, one latch unlocked, in the name of the FBI undercover agent, at a public baggage claim counter, where common experience suggests an individual seeking the suitcase might request the suitcase by name. Barry also made elaborate arrangements to turn over the luggage key and claim check, arrangements that, insofar as the record reflects, were frustrated only by Barry's untimely arrest. Both these alternatives were to the same end—to get the suitcase to "G. Nelson" after Barry collected the payment from Anderson. In light of these circumstances, I would hold that Barry cannot substantiate a subjective expectation of privacy in the suitcase, and that his suppression motion must fail.

Dissent at 1485.

This passage in many ways reflects the underlying character of the dissent's position. First, the dissent characterizes a suitcase which was locked and could only be opened by a key in Barry's sole possession as a "suitcase, one latch unlocked." Second, the dissent declares that Barry left the suitcase in the name of "an FBI under-

cover agent," thus implying a further diminished expectation of privacy. In response, Barry obviously did not believe "G. Nelson" was an FBI agent, and thus his actions should be viewed as any other transfer between two individuals. Third, the dissent asserts that one who leaves items of value in the care of a bailee and makes the effort to obtain a claim check commonly expects that these items will be given to anyone who knows the individual's name. We cannot believe that this is a "common" expectation. What then would be the purpose of obtaining the claim check? Fourth, that Barry made "arrangements" to transfer property, means to the dissent that the transfer was already made. Finally, the dissent, which characterizes this case as a "close" one, does not mention that the FBI agents had the suitcase in their possession for at least two hours prior to the warrantless search. The agents thus had a perfect opportunity to obtain a warrant if there were any doubts concerning the propriety of the search.

The dissent finds support for its position in the confidence that it is a "commonsense" approach to fourth amendment jurisprudence that will clarify the practical application of the law. We do not agree. Given Barry's retention of the key and claim check and the fact that he had not told Anderson where the suitcase was, a reasonable law enforcement officer clearly should have known that a warrant was required in these circumstances. Moreover, we believe that the dissent's position, built upon a series of assertions which do not themselves comport with "commonsense," provides no added clarity to the application of the law.

Moreover, *United States v. Capra,* 501 F.2d 267 (2d Cir.1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975), cited by the dissent, does not undermine the proposition that Barry had a reasonable expectation of privacy in the suitcase. In *Capra,* defendants Capra, Guarino, DellaCava, Ramos, and Jermain had received $150,000 of "front money" for a suitcase containing illegal drugs. With this, payment to the defendants was com-

plete, with the exception of Jermain, who was still owed a substantial sum of money. Based upon these facts, the court found the transaction was complete with respect to Capra, Guarino, DellaCava, and Ramos and that these defendants no longer had any reasonable expectation of privacy in the suitcase. The court, however, noted that the transaction was not complete with respect to Jermain and strongly suggested his expectation of privacy remained and would have provided him standing had he timely asserted his continuing interest in the suitcase.[2]

Viewed in this light, *Capra* stands for the proposition that when an individual intends to transfer a closed container to a third party, his expectation of privacy in that container's contents is lost *only* when the transaction is *completed with respect to that individual.*

It is true that Barry had received payment from the potential purchaser, as had Capra, Guarino, DellaCava and Ramos in the *Capra* case. However, unlike the defendants in *Capra,* Barry had not told the potential purchaser where the suitcase was. Moreover, Barry maintained further objective indicia of his control over the suitcase by his retention of the key and claim ticket. Thus, while the transaction was completed in every sense with respect to Capra, Guarino, DallaCava and Ramos in the *Capra* case, in the present case it was clearly *not* completed with respect to Barry. Thus *Capra* cannot control here.

Finally, the dissent finds support for its position in a supposed principle of "judicial reluctance to endorse a claimed subjective interest in privacy in property that the defendant clearly intended to transfer to a third party." Dissent at 1486, n. 1. However, the federal courts have not yet recognized such a "principle," and we fear the potential effect of this position on the long accepted, and vitally important, axiom that the sender of a letter retains an expectation of privacy protected by the fourth amendment in the contents of the letter after it is sent. *See United States v. Van Leeuwen,* 414 F.2d 758, 760 (9th Cir.1969), *aff'd,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed. 2d 282 (1970).

### III. *Exigent Circumstances*

In *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the Supreme Court declared the general rule that "luggage" or other closed containers may not be searched without a valid warrant. This remains a vital principle of constitutional law. The government contends that this search must nevertheless be upheld under the exigent circumstances exception to the warrant requirement. It maintains that the dark haired woman had not been located, and most of the money and tickets were still unaccounted for. Further, the government believed that the suitcase may have contained clues concerning the location of the money and tickets. Thus, the government allegedly feared there was an imminent danger the money and tickets might disappear before they could be recovered. Specifically, it believed that the dark haired woman in the interim might have been able to hide or destroy them.

In response, the record shows that two hours elapsed between the time the government seized the suitcase and the time it was forced open. During this period, the agents entrusted with the suitcase went about their investigation without any indication of an immediate need to open it. If the circumstances were truly exigent, they would have opened the suitcase at once. Moreover, we agree with the district court that the government could have obtained a warrant during this interval. Finally, based on the record, at least one of the agents who opened the suitcase appeared to believe both that the dark haired woman was Faith Annette Long and further realized that she was in custody at the moment the suitcase was opened.

---

**2.** The Court declared: "While Jermain might have been able to establish a possessory interest on the basis of the money owed, he did not seek to do so and cannot make such a claim for the first time now." 501 F.2d at 272.

Thus, we hold that the circumstances were not sufficiently exigent to allow the suitcase to be opened without a warrant.

### IV. *Conclusion*

For the foregoing reasons, the decision of the district court suppressing the evidence found in the warrantless search of Barry's suitcase is affirmed.

MAGILL, Circuit Judge, dissenting.

I respectfully dissent. Since *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court has consistently held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," "reasonable," or "legitimate" expectation of privacy. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). This inquiry normally embraces two discrete questions: (1) whether the individual, by his conduct, exhibited a "subjective" expectation of privacy; and (2) whether such subjective expectation, in the words of Justice Harlan, is "one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). It is with Barry's subjective claim of privacy that we are concerned.

The facts each side relies upon to advance its argument about Barry's subjective expectation of privacy in the suitcase are of doric simplicity. Barry maintains that his retention of the suitcase key and Tele–Ticket claim check shows that he intended to retain control over the suitcase and thus gives him a subjective expectation of privacy in its contents. The government argues in equal timbre that Barry had no intention of retaining any interest in the suitcase because he deposited it at the Tele–Ticket counter under the FBI agent's undercover name, "G. Nelson," an act the government contends evidenced Barry's intention to relinquish ownership and control of the suitcase.

The case law that the parties rely on is equally boldfaced. Barry directs us to a line of cases emanating from *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), which have consistently held that retention of a suitcase key is an effective expression of an individual's subjective expectation of privacy. *See Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981); *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *see also United States v. Oswald*, 783 F.2d 663 (6th Cir.1986); *United States v. Sanders*, 719 F.2d 882 (6th Cir.1983).

The government relies on *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), *United States v. Hershenow*, 680 F.2d 847 (1st Cir.1982), and others as authority for its position that Barry abandoned the suitcase or alternatively, sold his interest in it to the undercover agents. It can fairly be said, however, that none of these cases presented such ambiguous evidence of the defendant's subjective expectation of privacy in the container searched as does the case before us.

The danger in close cases such as this is that, in attempting to distinguish between these precedents, we spin the thread of argument so thin that we depart from a common-sense approach to all of the facts in the record. When considering the record as a whole, it is clear that any subjective expectation of privacy on Barry's part was undone by his own actions. He left a suitcase, one latch unlocked, in the name of the FBI undercover agent, at a public baggage claim counter, where common experience suggests that an individual seeking the suitcase might request the suitcase by name. Barry also made elaborate arrangements to turn over the luggage key and claim check, arrangements that, insofar as the record reflects, were frustrated only by Barry's untimely arrest. Both of these alternatives were to the same end—to get the suitcase to "G. Nelson" after Barry collected the payment from Anderson. In light of these circumstances, I would hold that Barry cannot substantiate a subjective expectation of privacy in the suitcase, and that his suppression motion must fail.

This approach finds support in *United States v. Capra*, 501 F.2d 267 (2d Cir.1974),

*cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975), a case very near to the one before this court.[1] In *Capra,* the defendants sought to deliver drugs to the buyer by the same method that Barry used to deliver stolen tickets to the buyer in this case: they put the drugs in a locked suitcase and checked the suitcase at a railroad station baggage room. The *Capra* court held that the defendants had no reasonable expectation of privacy in the suitcase, even though they retained the baggage claim check:

> Where defendants, through the use of front money and baggage checks, have exerted such efforts to insulate themselves from personal possession of [contraband], they are hardly in a position to object that they have been "hoist with their own petard." None of the defendants was able to prove that his reasonable expectations of privacy were infringed by the search of the suitcase.

*Id.* at 272 (citation omitted).

The majority, in attempting to distinguish *Capra,* makes much of the *Capra* court's intimation that one of the defendants "might have been able to establish a possessory interest [in the suitcase] on the basis of the money owed" to that defendant by the buyer. *Capra,* 501 F.2d at 272. The majority suggests that Barry was able to establish a possessory interest on the same ground here. This reasoning escapes me. It is simply wrong to suggest that the *Capra* court dicta applies in the present case, because Barry was paid *all* of the money he was owed by the undercover agents and thus, to use the majority's epigram, "the transaction was completed with respect to Barry."

The majority also suggests that *Capra* did not involve the Fourth Amendment. At 1480 n. 1. This argument takes a bit of license with the *Capra* court's opinion. A close reading of that case shows that the court performed a traditional Fourth

Amendment analysis, and only mentioned the "private search" rationale as an alternative holding in a footnote. *Capra,* 501 F.2d at 272 n. 4. In sum, there is little profit in maintaining, as the majority does, that *Capra* is distinguishable; if the majority is not persuaded by *Capra,* it should simply say so.

I also believe the majority rests more weight on *United States v. Presler,* 610 F.2d 1206 (4th Cir.1979), than that decision will support. As the majority's quote from that case makes clear, at 1482, Presler took great pains to ensure that the briefcases he entrusted to a friend for safekeeping remained free from search. Barry did just the opposite here, by putting the undercover agent's name on the suitcase, and leaving it for him at the Tele–Ticket counter. More to the point, *Presler* did not involve a delivery arrangement for contraband, and a search of a suitcase by a party whose name was on that suitcase, as this case does.

Finally, I am baffled by the majority's reference to *United States v. Van Leeuwen,* 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970). While I understand that the majority is attempting to analogize between the constitutional impregnability of letters or packages entrusted to the United States Post Office and the facts of this case, it has been clear for at least 110 years that the Fourth Amendment protection against intrusion into letters or packages does not extend to "searches" by the intended recipient of the letter or package. *See Ex Parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1878). The search in this case was conducted by the "addressee" of the suitcase, "G. Nelson." *Van Leeuwen* is thus inapposite.

In closing, I emphasize that I recommend only a limited departure from the understanding that suitcases will generally be entitled to the full range of Fourth Amendment protections once the defendant has

---

1. Additional support, although perhaps of a more analogous nature, is found in an espionage "drop" case, *United States v. Walker,* 624 F.Supp. 99 (D.Md.1985), where the district court held that the defendant relinquished his expectation of privacy when he attempted to leave property in a public place for a specific third party, his espionage contact. *Id.* at 101. Both *Capra* and *Walker* demonstrate judicial reluctance to endorse a claimed subjective expectation of privacy in property that the defendant clearly intended to transfer to a third party.

demonstrated a reasonable expectation of privacy in the suitcase's contents. *Sanders*, 442 U.S. at 763–65, 99 S.Ct. at 2592–94. I would hold only that, under the circumstances, Barry had no subjective expectation of privacy in the suitcase because he clearly intended that the suitcase be turned over to a third party.