**UNITED STATES of America**

v.

**John Edward TAYLOR, Kelly Stephen Twomey and Wayne Paul LaFrance.**

Crim. No. 80–100024 B.

United States District Court, D. Maine.

June 10, 1981.

James W. Brannigan, Portland, Me., F. Mark Terison, Auburn, Me., for Government.

Marvin D. Miller, Ronald Chisholm, Richard S. Emerson, Jr., for defendant.

## MEMORANDUM OF OPINION AND ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS

GIGNOUX, Chief Judge.

Defendants John Edward Taylor, Kelly Stephen Twomey and Wayne Paul LaFrance are charged in a one-count indictment with conspiring to possess with intent to distribute a large quantity of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 846. Presently before the Court are defendants' motions to suppress evidence pursuant to Fed.R.Crim.P. 12(b)(3) and 41. An evidentiary hearing has been held and the issues have been comprehensively briefed and argued by counsel. The following memorandum opinion contains the Court's findings of fact and conclusions of law, as required by Fed.R.Crim.P. 12(e).

### I.

### THE FACTS

#### A. *The Vessel "I FORGOT"*

At approximately 8:00 a. m. on the morning of September 7, 1979, Bryant Sutherland, a lobster fisherman from Sorrento, Maine, discovered a 51-foot Morgan sailing yacht, the I FORGOT, aground on ledge in the vicinity of Taft Point near Gouldsboro, Maine. The vessel's sails were down and no one appeared to be on board. Sutherland called other fishermen in the area to help. He then left and returned a few hours later, joining another fisherman who had arrived at the scene. The two men boarded the yacht. Sutherland observed green and brown vegetable matter, which he thought was marijuana—"everywhere you looked" —on the deck and below in the cabin. He also noted that the vessel appeared to be abandoned; there was no crew and there were no linens on the beds or personal effects on the boat.

At about 11:45 a. m., two other fishing boats arrived. They hooked onto the I FORGOT, floated it off the ledge, and towed the vessel to Sorrento. En route, Charles Bunker, one of the fishermen involved in the operation, called law enforcement authorities through a local citizens band radio network known as REACT. Bunker relayed the information that the vessel had been recovered and was being taken to Sorrento. While in tow, the I FORGOT rode low in the water, apparently because of the amount of water it had taken in. A small pump was used to remove some of the water. Upon arrival at Sorrento, Bunker secured the vessel to a mooring in the harbor and made arrangements to obtain a larger pump in order to keep the boat from sinking.

Defendants witnessed the salvaging of the I FORGOT. Taylor testified that the three defendants, hiding in the woods, observed for several hours fishing boats come and go, and hover about the stranded vessel. They watched as the fishermen floated it off the rocks and towed it away. After the boats had left, defendants departed. Taylor split from the other two and hitched a ride to Sorrento. When he arrived there, he saw the I FORGOT moored in the harbor. Observing a police car at the dock, he did not make any effort to claim the vessel.

Once the yacht had been moored in the harbor, Bunker, also the harbormaster, took his boat to the town dock and picked up Corporal Terry Parsons of the Maine State Police. Cpl. Parsons had answered the call put through earlier by Bunker. As Parsons boarded the vessel, he saw on its deck vegetable matter scraps which he recognized as marijuana debris. Below in the cabin he saw more marijuana debris scattered throughout—on the steps, on the floor, and floating on the water that covered the floor of the cabin. Parsons went back on deck, talked with several other fishermen, and

then went ashore. After calling police barracks, he drove to Taft Point, where the I FORGOT had been found.

The point on the shore where the boat was discovered lay about one mile from the main road that ran south from the town of West Gouldsboro. Parsons described the shoreline as a large pebble beach. He observed considerable marijuana debris on the shore, and found a flashlight, gas cap, hat, and two full cans of starting fluid on the beach.

About 3:00 p. m. Parsons returned to Sorrento harbor and joined Sergeant Harry Bailey and Trooper Michael Vittum of the Maine State Police, who had responded to Parsons' earlier call. Parsons reported to them his findings.

Vittum was ferried out to the I FORGOT by harbormaster Bunker. Bunker indicated concern that the Coast Guard arrive soon, because of his fear that the vessel was still taking on a lot of water. As he was boarding the I FORGOT, Vittum also observed marijuana debris on the deck and a strong marijuana-like odor emanating from the cabin. He went below to look for information pertaining to the vessel's crew. In a desk in the cabin, he found a navigational chart with certain markings and a tablet of writing paper.

Vittum returned to shore and drove to the area where the vessel had been found. At the end of the dirt road leading to the shore he observed tire impressions of a four-wheel drive vehicle. He also saw marijuana debris along the road. In the woods beside the road, about 1000 feet from the shore, he found two car batteries. He also found a storage bag for an inflatable Zodiac raft, paddles, a receipt for the car batteries, and a gas can. Marijuana residue covered the shore. As he had done on the I FORGOT, Vittum collected samples of the debris.

Around midnight the Coast Guard took custody of the vessel in Sorrento and towed it to Southwest Harbor. On the next day, September 8, Drug Enforcement Administration (DEA) Agent Wayne Steadman, accompanied by Vittum, took additional samples of the marijuana.

It was subsequently discovered that the owner of the I FORGOT was U. S. Northeast Leasing Co. and that on July 20, 1979, Norris Ashe, the president of U. S. Northeast Leasing Co., had leased the vessel for a three-week period to a John Taylor of 821 79th St., New York, New York. Taylor took possession of the vessel in Curacao on July 24. After giving inconsistent testimony with respect to the lessee's signature on the lease, which is illegible, Taylor finally acknowledged that he signed it. The address on the lease was not Taylor's. Ashe could not identify Taylor as the man who signed the lease.

B. *The Photographs*

On September 24, 1979, defendant LaFrance went to the Sea Mist Photo Finishing, Inc. in Hyannis, Massachusetts and left four rolls of 110 color film to be developed. He ordered three sets of 3½″ × 5″ prints. Sea Mist generally told customers they could pick up the film within 24 to 48 hours.

Gerald Schmeer and his brother Victor own and operate Sea Mist, a photo development laboratory located in a small, one-story addition to a residential structure in Hyannis. The laboratory area occupies most of the building. In the front corner of the ground floor is the customer area. A small counter separates the customer area from the processing area. Gerald Schmeer testified that customers frequently went behind the counter and entered the processing area, and that he used the counter regularly to roll out and correct color test prints.

Correcting color prints is a standard process which involves making partial test prints from the developed negatives. A partial print is a photographic print with only the center 2½″ developed. All the prints are contained on a roll of photo paper, which Gerald Schmeer customarily takes to the customer counter and unrolls. He examines each partial print individually to insure proper color and density, and marks any corrections on the print itself.

On September 26, 1979, while Gerald Schmeer was examining the partial test prints of the LaFrance order, Deputy Robert White of the Barnstable County Sheriff's office was talking with Victor Schmeer in the customer area of the shop next to the counter. White routinely visited the shop several times a week either for coffee and conversation with the Schmeers, or to deliver or pick up film for the Sheriff's office. His September 26 visit was a social call. Gerald Schmeer unrolled the test prints so that about 15 individual prints were visible. Examining the prints, he discovered that one showed a man holding a rifle surrounded by large bales. When he expressed surprise—"Jesus!"—at what the prints showed, White reflexively glanced at the unrolled prints, which were upside down from his vantage point. White then moved around the counter to get a better view. Gerald Schmeer continued to unroll the photo paper making visible the remaining test prints. White, an experienced police officer, recognized that the series of prints "appeared" to depict a marijuana smuggling enterprise "from start to finish." There were photographs of a three-man crew sailing a large yacht, the I FORGOT, in apparently tropical waters; and of men sporting a large rifle, holding wads of plant material that looked like marijuana, and sitting on large bales. Several photographs showed large amounts of money.

White asked Gerald Schmeer to hold the film and called his supervisor, Edward Woodfin. Woodfin arrived within 30 minutes and examined the test prints. The officers asked Gerald Schmeer to make a fourth set of prints for the police and to take down the license number of LaFrance's car. When LaFrance returned to the shop, he picked up the developed film and the three sets of prints he had ordered. The fourth set of prints was given to the police that same day.

## II.

### THE LAW

Defendants move to suppress all evidence obtained as a consequence of the seizure and search of the vessel I FORGOT. They also seek to suppress the fourth set of color prints which were obtained by the police from Sea Mist Photo Finishing. They contend that their Fourth Amendment rights were violated because there existed no exigent circumstances to excuse the warrantless seizure and search of the vessel and because a warrant was required in order to obtain the color prints.[1] The Court finds no merit in defendants' contentions.

The Fourth Amendment protects only those who have a "legitimate expectation of privacy" in the premises searched or the property seized. *Rawlings v. Kentucky*, 448 U.S. 98, 103–06, 100 S.Ct. 2556, 2560–62, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 130–31 n.1, 140, 148–49, 99 S.Ct. 421, 423–24 n.1, 428, 433, 58 L.Ed.2d 387 (1978). The evidence clearly establishes that defendants did not have such a legitimate privacy expectation in either the vessel or the photographs sufficient to support their Fourth Amendment challenges.

### A. *The Vessel*

Defendants have failed to show a sufficient proprietary or possessory interest in the vessel to support their claim of a reasonable expectation of privacy therein.

Defendants established no property interest in the I FORGOT at the time it was seized.[2] They did not own the vessel, which was owned by U.S. Northeast Leasing Co. The only legal interest defendants could claim in the vessel derives from the lease

---

1. Defendant LaFrance also had moved to suppress all evidence obtained in a search of his residence in Orleans, Massachusetts on January 14, 1980. The Government has represented it does not intend to use any of the items seized. The parties presented no evidence or argument concerning that seizure. Accordingly, it is not necessary to rule upon that motion.

2. Although property interests are not dispositive of the issue, they are relevant to consideration in determining one's reasonable and legitimate privacy expectation. *Rawlings v. Kentucky, supra*, 448 U.S. at 105–06, 100 S.Ct. at 2561–62; *Rakas v. Illinois, supra* 439 U.S. at 143–44 n.12, 149–50 n.17, 99 S.Ct. at 430–31 n.12, 433–34 n.17.

which Taylor signed. Under the terms of this lease, however, the vessel was chartered for a three-week period. The lease was dated July 20, 1979. Although the effective date of the charter was not specified in the document itself, Taylor testified that he took custody of the vessel on July 24, 1979. Accepting that latter date as the effective date of the charter, the lease had expired and defendants' leasehold interest had terminated long before the discovery of the vessel on September 7, 1979.[3]

■ Defendants failed to show a possessory interest in the vessel at the time it was discovered. The evidence discloses that they had abandoned the vessel. Abandonment is primarily a question of intent which may be inferred from "words spoken, acts done, and other objective facts." *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir. 1973) (en banc). *See United States v. Miller, supra* note 3, at 1131. In the instant case, the defendants' actions and the other objective facts conclusively establish abandonment.

The vessel was discovered hard aground on ledge in an unpopulated area along the Maine coast. There was no crew on board and no sign of anyone along the shore. There were no linens on the beds; no personal effects of any kind on the boat; and only a few scraps of food in the cabin. There was no message anywhere on the vessel and no other indication that the crew intended to return. The vessel was littered throughout with marijuana debris, suggesting that the vessel's cargo had been unloaded and the vessel then left behind on the rocks.[4] Although watching from the shore, defendants made no attempt to claim the

vessel while the fishermen were salvaging it. The objective facts negate any plausible inference that defendants intended to return to the vessel.

Defendants maintain that even if the objective facts justify a finding of abandonment, such abandonment was "involuntary." This argument is based upon the contention that defendants were forced by circumstances not to claim the vessel in order to avoid arrest. *See Walter v. United States,* 447 U.S. 649, 658 n.11, 100 S.Ct. 2395, 2402 n.11, 65 L.Ed.2d 410 (1980). Taylor testified that although he, Twomey and LaFrance were hiding in the woods close to shore and witnessed the salvaging of the I FORGOT, they did not lay claim to the vessel out of fear that the Coast Guard would soon arrive and they would be inviting arrest. Taylor further testified that he hitchhiked to Sorrento to claim the vessel once it had been towed away, but upon arriving at the harbor was deterred from coming forward by the presence of the police. Defendants argue that their subjective intent was not to abandon the vessel, and they were prevented from asserting ownership by the imminent threat of arrest.

■ The Court rejects this argument. The suggestion that defendants were deterred by the prospect of the Coast Guard's arrival while the fishermen were salvaging the vessel or by the existence of police at Sorrento harbor is unpersuasive. "Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary." *United States v. Colbert, supra* at 176. In the instant case defendants' failure to claim the I FORGOT

---

3. Defendants suggest that their right to the use of the vessel continued beyond the expiration date of the lease under the doctrine of demurrage. As defined by *Black's Law Dictionary,* 519 (4th ed. 1957), demurrage is

[t]he sum which is fixed by the contract of carriage, or which is allowed, as remuneration to the owner of a ship for the detention of his vessel beyond the number of days allowed by the charter-party ... for sailing. Even assuming that *defendants* derived corresponding possessory rights vis-a-vis all but the rightful owner of the vessel under this doctrine, such a right would merely bring the

Fourth Amendment analysis to the threshold inquiry of whether they nonetheless had a legitimate expectation of privacy therein. A person with a right to possess an item can use it in such a way as to forfeit a legitimate expectation of privacy therein. *See United States v. Miller,* 589 F.2d 1117, 1131 (1st Cir.), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979).

4. The Court rejects Taylor's testimony that he deliberately beached the vessel because of a heavy storm the previous night.

occurred substantially prior to police seizure and search of the vessel. *See United States v. Colbert, supra* at 177; *United States v. Masiello,* 491 F.Supp. 1154, 1160–61 (D.S.C. 1980). Defendants had ample opportunity to assert an interest in the vessel long before the police or the Coast Guard were on the scene—at the time the fisherman first appeared and tended to the vessel. Defendants watched the fishing boats for several hours without making an effort to claim the I FORGOT. By failing to assert control over the vessel, defendants forfeited any legitimate expectation of privacy in the vessel. *See United States v. Miller, supra* at 1131. It is settled law that one has no standing to challenge a search or seizure of property he has voluntarily abandoned. *See, e. g., Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960).

### B. *The Photographs*

■ Defendants have failed to show a reasonable expectation of privacy in the film LaFrance delivered to Sea Mist Photo for processing.

■ "[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois, supra,* 439 U.S. at 143–44 n.12, 99 S.Ct. at 430–31 n.12. In order to merit constitutional protection, an individual's subjective expectation of privacy must be "one that society is prepared to recognize as 'reasonable.'" *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). Even if LaFrance had

a subjective expectation of privacy in the film given to Sea Mist Photo for development, such an expectation was not reasonable.

■ LaFrance voluntarily gave a film depicting apparent criminal activity to a commercial establishment for development. In so doing, he necessarily was aware that the employees of Sea Mist Photo would view the prints of that film. He could have had no reasonable expectation of privacy in information thus voluntarily conveyed and necessarily so exposed to the employees of a commercial establishment. *See Smith v. Maryland, supra* 442 U.S. at 743–44, 99 S.Ct. at 2581–82; *United States v. Miller,* 425 U.S. 435, 442–43, 96 S.Ct. 1619, 1623–24, 48 L.Ed.2d 71 (1976); *Couch v. United States,* 409 U.S. 322, 335–36, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973). Moreover, in giving film depicting apparent criminal activity to a commercial establishment for development, LaFrance "[took] the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *United States v. Miller, supra* 425 U.S. at 443, 96 S.Ct. at 1624.[5] One participating in illegal activities cannot reasonably expect that disclosures made to third persons will enjoy constitutional protection simply because of an assumption that the information will not be revealed to the government. *Smith v. Maryland, supra; United States v. Miller, supra; United States v. White,* 401 U.S. 745, 751–52, 91 S.Ct. 1122, 1125–26, 28 L.Ed.2d 453 (1971); *Hoffa v. United States,* 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). The police "seized" no more than Schmeer had observed and inadvertently revealed to White.

---

**5.** The Court rejects LaFrance's testimony that Schmeer told him that he would be the only one to see the film. Although Schmeer did not specifically recall his conversation with LaFrance, his unequivocal testimony was that it was not his practice to give assurances of confidentiality to customers and that he had never done so. In any event, the Supreme Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of infor-

mation revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed. *United States v. Miller, supra* at 443, 96 S.Ct. at 1624.

### III.

### ORDER

Defendants' motions to suppress evidence are in all respects denied.

IT IS SO ORDERED.