900 F.2d 1234
 WABUN-ININI, aka Vernon Bellecourt, Appellant,
v.
William SESSIONS, Director, Federal Bureau of Investigation,
Washington, D.C.; Jeffrey J. Jamar, Agent-in-Charge,
Minneapolis Office of the FBI, Minneapolis, Minnesota;
Peter Cunningham, Special Agent, Minneapolis Office of the
FBI, Minneapolis, Minnesota; William Clifford, Special
Agent, Minneapolis Office of the FBI, Minneapolis,
Minnesota; John Doe; Jane Doe, and other presently unknown
officials of the United States Government, Appellees.
WABUN-ININI, aka Vernon Bellecourt, Appellee,
v.
William SESSIONS, Director, Federal Bureau of Investigation,
Washington, D.C.; Jeffrey J. Jamar, Agent-in-Charge,
Minneapolis Office of the FBI, Minneapolis, Minnesota;
Peter Cunningham, Special Agent, Minneapolis Office of the
FBI, Minneapolis, Minnesota; William Clifford, Special
Agent, Minneapolis Office of the FBI, Minneapolis,
Minnesota; John Doe; Jane Doe, and other presently unknown
officials of the United States Government, Appellants.
 Nos. 89-5471, 89-5521.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 13, 1989.
Decided April 9, 1990.
Rehearing and Rehearing En Banc Denied June 1, 1990.
 
 C. Peter Erlinder, St. Paul, Minn., for appellant.
 Neil H. Koslowe, Washington, D.C., for appellees.
 Before JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Appellant Wabun-Inini left two rolls of color film at a One Hour Photo Store for processing. An FBI agent entered the store soon thereafter, ordered an extra set of prints of Wabun-Inini's photographs, and returned later and purchased them. The primary issue in this appeal is whether the Fourth Amendment prohibits the FBI from executing a warrantless purchase, and thus a seizure, of Wabun-Inini's photographs. Wabun-Inini also raises issues concerning the First Amendment, the Privacy Act of 1974, codified at 5 U.S.C. Sec. 552a (1988), and the FBI's ex parte, in camera submissions to the district court. The district court[1] denied injunctive relief to Wabun-Inini on both his Fourth Amendment claim, based on the narrow ground that the finished photographs were exposed to public view during processing, and on his Privacy Act claim. We affirm.
 
 
 2
 The parties have stipulated to most of the facts. On March 22, 1989, Wabun-Inini brought two rolls of color film to the F-Stop One Hour Photo Store in Minneapolis, Minnesota for processing. Wabun-Inini frequently had film developed at this F-Stop, which was located within an enclosed shopping mall. An F-Stop employee told Wabun-Inini to return later in the day to pick up the finished photographs. Wabun-Inini acknowledges that when he left his film at the F-Stop, he anticipated that F-Stop employees might inspect the negatives and prints as necessary to develop and print the film properly. He contends, however, that he did not expect his prints to be shown to others, that he did not authorize F-Stop employees to disclose them to others, and that he was not aware that his photographs might be visible from a public area during processing.
 
 
 3
 About twenty-five minutes after Wabun-Inini left the F-Stop, FBI Special Agent Peter Cunningham entered the store and asked to speak with the manager. An F-Stop employee informed Cunningham that the manager was not in the store. Cunningham identified himself to the employee as an FBI Special Agent, requested to come behind the counter to speak with the employee, and then asked if he could purchase a set of prints from the film Wabun-Inini had left to be developed. The employee took Cunningham behind the counter to a processing machine and located the negatives developed from the film left by Wabun-Inini. The employee then escorted Cunningham back to the manager's office and gave him the negatives. When Cunningham entered the store, he did not know which set of negatives were Wabun-Inini's nor did know what specific images were on the negatives. Also, Cunningham had not been in contact with F-Stop employees concerning Wabun-Inini's photographs before this incident.
 
 
 4
 While Cunningham was examining the negatives, the employee called in the F-Stop night manager. Cunningham identified himself to her as an FBI agent and asked if he could obtain a set of prints from Wabun-Inini's negatives. The night manager agreed. Cunningham returned to the store later and purchased a set of prints for nineteen cents per print.
 
 
 5
 The parties further stipulated that, at the time of the incident in question, the F-Stop used a Noritsu System II model color photo processing system for developing film and making prints from negatives. This system was located behind a customer counter. The developing machines were behind the counter to the customers' left, and the printing machines were behind the counter to the customers' right.
 
 
 6
 After the negatives were processed through the Noritsu system, they were hung on a rack which was in plain view from the customer counter. A printer technician passed the negatives under a light on the Noritsu film processing machine to inspect each negative in order to make any necessary adjustments in the printing process. After the negatives were examined, they were hung on a second rack. This process occurred approximately ten to twelve feet from the customer counter and the images on the negatives were not recognizable from the counter.
 
 
 7
 The negatives were then placed in the Noritsu machine for printing. The printed photographs emerged in roll form from the Noritsu machine, and each print was conveyed past a clear glass window for ten to fifteen seconds. They could have been displayed upside down, right side up, or rotated 90 degrees left or right.[2] Customers and the general public could have seen the photographs through a clear glass window located in an area to the right of the customer counter. Customer prints were not exposed to view from any public area except for the ten to fifteen seconds in the viewing window. A pillar separated the viewing window from the service counter, and a free standing sign was frequently placed in the area of the counter, pillar, and window, making viewing the photo-prints more difficult. There were no signs indicating the existence of a viewing area or that prints could be viewed in the Noritsu machine. Also, store employees frequently covered the viewing window for privacy when the subject matter of the photographs was particularly intimate or sensitive.
 
 
 8
 On the date that Wabun-Inini brought his film in for processing, the Noritsu printing machine with the viewing window was located 2 1/2 feet from the area to the right of the pillar. This arrangement of the photo processing system, which made most film processing functions within public view, was done intentionally. The F-Stop wanted customers to see that film and prints were processed on site and that processing could be completed expeditiously. The F-Stop, however, did not specifically advertise that processing was completed on site.
 
 
 9
 Thus, each print made from the film Wabun-Inini gave the F-Stop was conveyed past the Noritsu clear glass window where it could have been observed by the public from a distance of approximately 2 1/2 feet. At the time Cunningham entered the store and inquired about Wabun-Inini's film, the film processing had not yet been completed, and so neither the F-Stop employees nor the general public, including Cunningham, had viewed his negatives or photographs.
 
 
 10
 Upon Wabun-Inini's return to the F-Stop, store employees informed him that they had provided the FBI with prints of his film upon request by the FBI. On May 12, 1989, Wabun-Inini filed a complaint seeking a declaration that the Government's seizure of the prints was unlawful and requesting injunctive relief. The district court granted Wabun-Inini's motion for a preliminary injunction.
 
 
 11
 The Government then submitted additional evidence, however, including evidence reviewed ex parte and in camera, and on August 18, 1989, the court dissolved the preliminary injunction and granted a partial summary judgment[3] in favor of the Government. The court found that Wabun-Inini had no reasonable expectation of privacy in the prints because they were exposed to public view during processing. It emphasized that its holding was based on the narrow ground that the particular film processing equipment in use resulted in public exposure of the developed prints. The court directed that the preliminary injunction would remain in force for thirty days and throughout appeal if Wabun-Inini filed a notice of appeal within thirty days. Wabun-Inini filed his notice of appeal on September 11, 1989, within the thirty-day period.
 
 
 12
 The FBI subsequently filed a motion asking this court to suspend the injunction pending appeal. On November 13, 1989, this court heard argument on the motion as well as on the merits of the underlying suit. On November 16, we set aside the injunction pending appeal entered by the district court. We now address the merits of Wabun-Inini's action against the Government, in which he argues that the district court erred in: (1) granting the Government's motion for summary judgment; (2) finding that the warrantless seizure of the photographs did not violate the Fourth Amendment; (3) holding that the First Amendment and the Privacy Act did not entitle him to injunctive relief; and (4) reviewing the Government's ex parte, in camera submissions without requiring a detailed, public record supporting such submissions.
 
 I.
 
 13
 Wabun-Inini argues that the district court erred in granting the Government's motion for summary judgment because genuine issues of material fact existed, and because the court failed to view the facts in the light most favorable to the nonmoving party. Specifically, he alleges that the court failed to consider the facts contained in the declarations of Michael Block, the F-Stop manager; Anthony D'Angelo, an FBI Special Agent; and in a statement given by Wabun-Inini on August 10, 1989. He contends that these declarations collectively raise issues of credibility which must be resolved by a jury, and also that the Block declaration raises issues of material fact concerning the public's reasonable expectation of privacy.
 
 
 14
 The standard for granting summary judgment is firmly established. It is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give him the benefit of all reasonable inferences to be drawn from the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir.1986). We recognize that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries. Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir.1988). We are also cognizant, however, of the principle that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554-55, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1).
 
 
 15
 Wabun-Inini bases his argument that the district court failed to consider the declarations of Block, D'Angelo, and himself, on the absence of specific references to them in the court's findings of fact. Summary judgment may only be granted when there are no genuine issues of material fact and, thus, for a court to make findings of fact is antithetical to that inquiry. We have said, however, that a discussion of the reasons for the grant or denial of summary judgment "can be most helpful not only to the litigants, but to a reviewing court as well." Mini Mart v. Direct Sales Tire Co., 876 F.2d 63, 65 (8th Cir.); Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). The facts relied upon by the court are critical to its reasons for the grant or denial of summary judgment. We thus may look to the court's recitation of the material facts to assist in our inquiry. Anderson v. Liberty Lobby, 477 U.S. 242, 250 n. 6, 106 S.Ct. 2505, 2511 n. 6, 91 L.Ed.2d 202 (1986); 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure 2716, at 647-50 (2d ed. 1983). After examining the facts recited by the court below and the transcript of the motion hearing, we are satisfied that the court did consider these declarations and did so in the light most favorable to Wabun-Inini. While the written statement of facts was taken verbatim from the parties' Joint Stipulation of Facts, the court also adopted in full the July 12, 1989 statement of Block. Furthermore, the D'Angelo declaration is discussed at length in the Joint Stipulation of Facts which was before the court. Finally, the essence of the assertions contained in the August 10, 1989 declaration of Wabun-Inini merely replicated those contained in various other pleadings and records before the court.
 
 
 16
 The claimed credibility issues raised by these declarations are insufficient to preclude summary judgment. The standard for considering summary judgment, "[b]y its very terms, ... provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Liberty Lobby, 477 U.S. at 247-48, 106 S.Ct. at 2510 (emphasis in original). Since the parties stipulated to most of the facts central to this suit and the court below accepted, without Government objection, the assertions contained in the declarations identified by Wabun-Inini, we believe that the claimed credibility issues do not rise to the level of materiality necessary to prevent summary judgment.
 
 
 17
 Moreover, we are not convinced that the specific Block statements identified by Wabun-Inini, when viewed most favorably to him, create a genuine issue of material fact. Genuineness requires that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, 106 S.Ct. at 2510. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50, 106 S.Ct. at 2511 (emphasis added and citations omitted). Wabun-Inini alleges that the following statements in the Block declaration create genuine issues of material fact regarding the public's reasonable expectation of privacy: (1) that the images on negatives are not visible from the customer counter; (2) that black and white film processing is not done on site; (3) that the viewing window may display photo-prints upside down or sideways; (4) that the viewing window is frequently covered when the subject matter of the photographs is particularly intimate or sensitive; and (5) that a pillar and sign make viewing photo-prints more difficult. In light of the overwhelming evidence that Wabun-Inini's photo-prints were openly displayed to public view during processing, we are persuaded that these assertions are insufficiently probative to prevent summary judgment on the issue of whether Wabun-Inini's subjective expectation of privacy was objectively reasonable.
 
 II.
 
 18
 The central issue in this appeal is Wabun-Inini's assertion that the district court erred in granting summary judgment based on its holding that the warrantless seizure of Wabun-Inini's photographs from the F-Stop photo processor did not violate the Fourth Amendment. Finding no merit in this contention, we affirm the court's holding that the Fourth Amendment has not been violated because Wabun-Inini's subjective expectation of privacy is not objectively reasonable.
 
 
 19
 The Fourth Amendment provides, in part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In the seminal case of Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), Justice Harlan first articulated the analysis that has since evolved into the standard for determining whether a governmental search or seizure violates the Fourth Amendment. "[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " Id. at 361, 88 S.Ct. at 516 (Harlan, J., concurring); see California v. Ciraolo, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811-12, 90 L.Ed.2d 210 (1986); Oliver v. United States, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740-41, 80 L.Ed.2d 214 (1984).
 
 
 20
 Accordingly, our initial inquiry is whether Wabun-Inini had a subjective expectation of privacy in his film and processed prints when he brought film to the F-Stop for development. We deal with this issue summarily, as we agree with the district court's conclusion, supported by the record, that Wabun-Inini held such an expectation.
 
 
 21
 We now turn to the more difficult issue of whether Wabun-Inini's subjective expectation of privacy is one "that society is prepared to recognize as 'reasonable.' " Katz, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).
 
 A.
 
 22
 Wabun-Inini argues that we should consider his Fourth Amendment claim with heightened scrutiny because it implicates his First Amendment right of freedom of association. He is correct in recognizing that searches and seizures involving items protected by the First Amendment may be subject to a more demanding scrutiny than would otherwise be the case. The First Amendment sometimes "imposes special constraints on searches for and seizures of presumptively protected material, and requires that the Fourth Amendment be applied with 'scrupulous exactitude' in such circumstances." Maryland v. Macon, 472 U.S. 463, 468, 105 S.Ct. 2778, 2781, 86 L.Ed.2d 370 (1985) (citations omitted) (quoting Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 511-12, 13 L.Ed.2d 431 (1965)); see Zurcher v. Stanford Daily, 436 U.S. 547, 564, 98 S.Ct. 1970, 1980-81, 56 L.Ed.2d 525 (1978); Roaden v. Kentucky, 413 U.S. 496, 504-05, 93 S.Ct. 2796, 2801-02, 37 L.Ed.2d 757 (1973); see also Stanford v. Texas, 379 U.S. at 485, 85 S.Ct. at 512 ("No less a standard could be faithful to First Amendment freedoms.").
 
 
 23
 The Supreme Court, however, has refused to extend this heightened scrutiny to all searches and seizures involving First Amendment rights. See New York v. P.J. Video, 475 U.S. 868, 875, 106 S.Ct. 1610, 1615, 89 L.Ed.2d 871 (1986) (rejecting assertion that warrant to seize material protected by First Amendment requires higher standard of probable cause); Macon, 472 U.S. at 469, 105 S.Ct. at 2781-82 (holding that heightened scrutiny is not necessary where police officer purchased magazine from bookstore as evidence); Zurcher, 436 U.S. at 565, 98 S.Ct. at 1981-82 (rejecting contention that more than warrant issued on probable cause was required to seize photographs from newspaper office); Heller v. New York, 413 U.S. 483, 490, 93 S.Ct. 2789, 2793-94, 37 L.Ed.2d 745 (1973) (holding that First Amendment does not require hearing prior to seizing film as evidence when seizure did not prevent film from being exhibited).
 
 
 24
 More importantly, for our purposes, the Court has explicitly stated that the reason for applying the more demanding standard in the First Amendment context is the special threat posed by prior restraints to First Amendment guarantees. "The risk of prior restraint, ... is the underlying basis for the special Fourth Amendment protections accorded searches for and seizures of First Amendment materials...." Macon, 472 U.S. at 470, 105 S.Ct. at 2782; see Fort Wayne Books v. Indiana, 489 U.S. 46, 109 S.Ct. 916, 928, 103 L.Ed.2d 34 (1989); see also Roaden, 413 U.S. at 504, 93 S.Ct. at 2801 (noting that heightened scrutiny was necessary where "the taking brought to an abrupt halt an orderly and presumptively legitimate distribution or exhibition").
 
 
 25
 Wabun-Inini urges that we apply the "scrupulous exactitude" standard to situations where a search or seizure implicates freedom of association. In light of the Supreme Court's declaration, however, that the special protections are necessary only because of prior restraints, which are not an issue in this case, we do not believe that this demanding standard is applicable here.[4]B.
 
 
 26
 In determining whether Wabun-Inini's expectation of privacy is objectively reasonable, we recognize, as did the court below, that this is an area of law that is not easily reduced to bright line rules and black letter law. Our task here is eased, however, by examining a principle which has remained steadfast over time: "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." Katz, 389 U.S. at 351, 88 S.Ct. at 511. Recognition of this principle leads us to conclude that there has been no Fourth Amendment violation here. Wabun-Inini's subjective expectation of privacy is not one "that society is prepared to recognize as 'reasonable,' " id. at 361, 88 S.Ct. at 516 (Harlan, J., concurring), in light of the record revealing that his photographs were exposed to public view during the development process.
 
 
 27
 Although we determine whether an expectation of privacy is objectively reasonable on a case-by-case basis, O'Connor v. Ortega, 480 U.S. 709, 718, 107 S.Ct. 1492, 1498-99, 94 L.Ed.2d 714 (1987), support for our holding is also found in judicial precedent. The recent Supreme Court decision in California v. Greenwood, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), is particularly enlightening. In Greenwood, residents of a house contended that their expectation of privacy in trash, which was enclosed in opaque plastic bags and left on the curb in front of their home for collection, was violated by police search and seizure of the trash. Id. at 39, 108 S.Ct. at 1628. They argued that the "trash was only temporarily on the street, and there was little likelihood that it would be inspected by anyone." Id.
 
 
 28
 While the Court recognized that the individuals might subjectively expect that their trash would not be exposed to others, it held that this expectation was objectively unreasonable because they had "exposed their garbage to the public sufficiently to defeat their claim to Fourth Amendment protection." Id. at 40, 108 S.Ct. at 1628. We believe that the same is true here. Wabun-Inini's use of the F-Stop for photo processing exposed his photographs to the public sufficiently to defeat his claim to Fourth Amendment protection.
 
 
 29
 Wabun-Inini unsuccessfully attempts to factually distinguish Greenwood from the case before us. He claims that "the trash collector in Greenwood never contracted to perform specified services on the owner's property," (Appellant's Brief at 11), but we believe that the relationship there is sufficiently similar to that between Wabun-Inini and the F-Stop to justify our conclusion that Greenwood controls this case. In both cases, an individual voluntarily turned over his property to a third party in circumstances making it unreasonable to claim surprise that the property was exposed to public view for a limited time. Wabun-Inini also attempts to distinguish Greenwood on the ground that "[t]he trash in Greenwood was abandoned, for all practical purposes." (Appellant's Brief at 11). This fails to recognize that the Court's decision in Greenwood did not turn on the ultimate disposition of the property, i.e., abandoned versus returned, but rather on the fact that the individuals exposed their property to the public to a degree sufficient to make their claims to privacy objectively unreasonable.
 
 
 30
 Wabun-Inini also relies on the Court's statement in Greenwood that it was common knowledge that trash left on the curb is accessible to the public. In contrast, he urges that the technical aspects of film processing at the F-Stop are far from a matter of common knowledge. He emphasizes that F-Stop customers may not even be aware that processing is done on site, that customers may not know that the Noritsu machine exposes photo-prints during processing, that the viewing window may be covered by store employees, that the Noritsu machine is not readily visible from the customer service area, and that photographs may be exposed upside down or rotated to the left or right. According to Wabun-Inini, these circumstances mean that public observation of the photographs is merely a "theoretical possibility," unlike the situation in Greenwood.
 
 
 31
 The flaw in this reasoning is that the risk of public exposure in Greenwood was also only a "theoretical possibility," and yet the Court held that it was sufficient to make the individuals' expectation of privacy in their trash objectively unreasonable. The Court's decision there did not turn on the trash actually being inspected by the public. Rather, the case hinged upon the knowledge that "animals, children, scavengers, snoops, and other members of the public," id. at 40, 108 S.Ct. at 1628-29 (footnotes omitted), had access to the trash. In other words, the police in Greenwood did not have to establish that animals, children, scavengers, etc., had, in fact, exposed the trash to public view, because the theoretical possibility of such happening was sufficient to make an expectation that the trash would remain private objectively unreasonable.
 
 
 32
 Applying this reasoning here, the FBI did not need to show that the public had a common knowledge of photo processing techniques, or that members of the public actually viewed Wabun-Inini's photographs when they were displayed in the Noritsu machine. Instead, the FBI had the burden of showing that Wabun-Inini exposed his photographs to the public sufficiently to make his claim of Fourth Amendment protection objectively unreasonable. It has met this burden by establishing in the record that Wabun-Inini's photographs emerged from the printing machine in roll form behind a clear glass window, were each exposed to public view for about ten to fifteen seconds, and could have been viewed by the public from a distance of about 2 1/2 feet. The type of processing equipment used by F-Stop, combined with the physical lay-out of the store, defeat Wabun-Inini's expectation of privacy. As the district court observed, any individual, standing in or walking by the store, could have stopped and observed the photographs, through a glass wall in plain view, as they rolled out of the Noritsu machine. The placement of a pillar and freestanding sign in the area would have made their observation more difficult, but the simple fact remains that the photographs were there for the public to see.
 
 
 33
 Other cases also demonstrate the principle that property knowingly exposed to public view is not the subject of Fourth Amendment protection. In California v. Ciraolo, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the Court held that the respondent's expectation that his backyard, fenced by a six-foot outer fence and ten-foot inner fence, was protected from police aerial surveillance, was objectively unreasonable. Id. at 209, 214, 106 S.Ct. at 1810-11, 1813. "In an age where private and commercial flight in the public airways is routine, it is unreasonable for respondent to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet." Id. at 215, 106 S.Ct. at 1813; see also Dow Chemical Co. v. United States, 476 U.S. 227, 239, 106 S.Ct. 1819, 1827, 90 L.Ed.2d 226 (1986) (holding that the EPA's aerial observation of an industrial complex using sophisticated surveillance equipment did not violate the Fourth Amendment); Oliver v. United States, 466 U.S. 170, 179, 104 S.Ct. 1735, 1741-42, 80 L.Ed.2d 214 (1984) (upholding warrantless search of land with marijuana crops based on the open fields doctrine); Marshall v. Barlow's, 436 U.S. 307, 315, 98 S.Ct. 1816, 1821-22, 56 L.Ed.2d 305 (1978) ("What is observable by the public is observable, without a warrant, by the Government inspector as well.").
 
 
 34
 The district court's order described its holding as resting on the "slender reed of the particular type of film processing machine which provided for public viewing of the developed prints." Wabun-Inini argues that "a reasonable expectation of privacy should not turn upon the existence of unadvertised, technical characteristics of particular pieces of equipment." (Appellant's Brief at 13). The FBI also urges that we adopt a broader rule. (Appellee's Brief at 10-11). The very nature of the Fourth Amendment inquiry, however, mandates that factors such as the lay-out of the store and the type of equipment are critical to the result. The reasonableness of one's expectation of privacy differs according to the context in which it is examined. O'Connor, 480 U.S. at 716, 107 S.Ct. at 1497-98. It must be addressed on a case-by-case basis. Id. at 718, 107 S.Ct. at 1498-99. We must consider a variety of factors such as "the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion." Oliver, 466 U.S. at 178, 104 S.Ct. at 1741 (citations omitted). We therefore affirm the district court's narrow holding.
 
 
 35
 We need not decide here whether customers of photo processors, in general, lose their expectations of privacy in film and photographs left for development by virtue of conveying their property into the hands of a third party.[5] We simply hold that Wabun-Inini's decision to leave his film with the photo processor in this instance, which used processing techniques involving exposure of the photographs to public view for a limited time, make his expectation of privacy objectively unreasonable. Accordingly, we hold that the FBI action here did not violate Wabun-Inini's rights under the Fourth Amendment.
 
 C.
 
 36
 In addition to the above arguments concerning the seizure of the photographs, Wabun-Inini argues that the FBI also violated his Fourth Amendment rights by viewing the negatives made from the film which he brought to the F-Stop. Essentially, Wabun-Inini identifies two separate Fourth Amendment violations: (1) when Agent Cunningham first picked up the negatives and examined them; and (2) when Agent Cunningham purchased copies of the photographs made from Wabun-Inini's film. We focus here on the former allegation.
 
 
 37
 Wabun-Inini contends that only actual exposure to public view could defeat his expectation of privacy in the film. Since the FBI seized the negatives before they had been printed and exposed to public view, Wabun-Inini urges that he still retained an expectation of privacy in the negatives at the time of seizure. According to him, public exposure of his photographs by the Noritsu machine was merely a possibility, not a certainty, at the time he brought the film in because of the following circumstances: (1) black and white film was not developed on the premises; (2) store employees inspected color negatives before processing them and did not process them in the Noritsu machine if they were technically flawed; (3) the Noritsu machine might have been broken; and (4) the viewing window on the Noritsu machine might have been covered.
 
 
 38
 This argument has no merit. Wabun-Inini's expectation of privacy, regarding the film, the negatives, and the photographs, was established at the time he left the film with the F-Stop for development. Subsequent events, of which he was unaware, did not alter his expectation of privacy. While it is true that Wabun-Inini's photographs would not have been exposed to public view if the film had been flawed, if the machine had been broken, if the machine window had been covered, or if lightning had struck the F-Stop, the simple fact remains that, when he dropped off his film, he expected to return later to pick up his developed photographs. That is exactly what happened here. The remote possibility that events might not unfold exactly as planned, including the possibility that an FBI agent might examine his negatives while the film was being processed, did not change his expectations.
 
 
 39
 The Supreme Court discussed this principle in Walter v. United States, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). In Walter, the Court held that an individual's expectation of privacy in the contents of a package mailed by common carrier was determined by "the condition of the package at the time it was shipped unless there is reason to assume that it would be opened before it arrived at its destination." Id. at 658-59 n. 12, 100 S.Ct. at 2402-03 n. 12 (emphasis added). In so holding, the Court rejected an argument to the contrary and stated that "it is difficult to understand how [the senders'] subjective expectation of privacy could have been altered in any way by subsequent events of which they were obviously unaware." Id.
 
 
 40
 The cases cited by Wabun-Inini are inapposite. In United States v. Barry, 853 F.2d 1479 (8th Cir.1988), the FBI seized a suitcase from an airport counter and searched it without a warrant. The FBI contended that Barry, the owner of the suitcase, had relinquished his expectation of privacy because he had intended eventually to transfer the suitcase to a third party in order to sell its contents. Id. at 1481. The court rejected this argument because the transaction was far from complete in Barry's mind. He had locked the suitcase and retained the keys, he did not give the airport counter a right of general access to the suitcase, and he entrusted the counter with the suitcase solely for safekeeping. Id. at 1481-82. Thus, it still remained a viable option for him to change his mind and void the sale. The same cannot be said of Wabun-Inini's situation. The record before us contains no suggestion that Wabun-Inini entertained any idea of returning to the F-Stop to retrieve his film before it was developed because he had changed his mind. By way of contrast, the steps necessary to effect development of the film were completed when Wabun-Inini left it at the F-Stop. The other cases cited by Wabun-Inini similarly do not aid his case. See United States v. Capra, 501 F.2d 267 (2d Cir.1974) (holding that individual lost expectation of privacy in closed container transferred to third party only when the transaction was completed with respect to that individual), cert. denied, 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975); see also United States v. Van Leeuwen, 414 F.2d 758 (9th Cir.1969), rev'd, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970).
 
 
 41
 We also note that the record reveals that a printer technician at the F-Stop inspected the quality of the negatives and examined them in order to choose the proper density for printing the negatives. While the employee's attention may have been focused primarily on the characteristics of the negatives affecting the development process, the image on each negative was nevertheless fully visible to the employee. We need not decide, however, whether this exposure was sufficient to defeat Wabun-Inini's subjective expectation of privacy because we resolve this issue on narrower grounds. Regardless of the effect of the employees observing the images on the negatives, the simple fact remains that, after inspection, the negatives were processed through the Noritsu system and the images observable by store employees were then openly displayed to the public as photo-prints.
 
 
 42
 Accordingly, we conclude that no right protected by the Fourth Amendment was violated by the FBI's warrantless temporary seizure and inspection of the negatives processed from the film left by Wabun-Inini.
 
 III.
 
 43
 Wabun-Inini contends that the district court also erred in concluding that the Privacy Act of 1974, codified at 5 U.S.C. Sec. 552a, did not permit injunctive relief for his First Amendment claim. The specific provision of the Act upon which Wabun-Inini relies provides:
 
 
 44
 Each agency that maintains a system of records shall--
 
 
 45
 ....
 
 
 46
 (7) maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity.
 
 
 47
 5 U.S.C. Sec. 552a(e).
 
 
 48
 This circuit has not had occasion to address whether injunctive relief is available under this section to an individual concerned about records being maintained on his exercise of First Amendment rights. The civil remedies available under the Act are described in section 552a(g). Since Congress expressly enumerated in this section where injunctive relief is available, some courts have refused to expand the availability of injunctive relief to other violations of the Act. See, e.g., Doe v. Stephens, 851 F.2d 1457, 1463 (D.C.Cir.1988); Edison v. Department of the Army, 672 F.2d 840, 846 (11th Cir.1982); Parks v. IRS, 618 F.2d 677, 684 (10th Cir.1980); Cell Assoc. v. National Inst. of Health, 579 F.2d 1155, 1157-62 (9th Cir.1978); Houston v. United States Dep't of Treasury, 494 F.Supp. 24, 29 (D.D.C.1979).
 
 
 49
 Other courts, however, particularly the District of Columbia Circuit, have faced the specific issue of the availability of injunctive relief for violations of section 552a(e)(7), concerning First Amendment rights, and have not felt constrained by the Act's failure to expressly grant injunctive relief in this context. See, e.g., Smith v. Nixon, 807 F.2d 197, 204 (D.C.Cir.1986); Hobson v. Wilson, 737 F.2d 1, 64-65 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); Clarkson v. IRS, 678 F.2d 1368, 1376 (11th Cir.1982), aff'd, 811 F.2d 1396 (11th Cir.), cert. denied, 481 U.S. 1031, 107 S.Ct. 1961, 95 L.Ed.2d 533 (1987); Albright v. United States, 631 F.2d 915, 921 (D.C.Cir.1980). Of these cases, only Clarkson involved the law enforcement exemption, and the decision specifically discusses the applicability of the exemption. 678 F.2d at 1374-75.
 
 
 50
 Our examination of the record and of the cases cited above does not cause us to conclude that the district court erred in ruling that injunctive relief was not permitted for violations of section 552a(e)(7). We are convinced, however, that injunctive relief is not authorized by the Act until the Act has actually been violated. The plain language of the Act authorizes maintaining records on the exercise of First Amendment rights if "pertinent to and within the scope of an authorized law enforcement activity." 5 U.S.C. Sec. 552a(e)(7). The FBI claims that this exemption applies to its activities here because its purchase and maintenance of Wabun-Inini's photographs is "pertinent to and within the scope of an authorized law enforcement activity." (Appellee's Brief at 23). It cites the declaration of FBI Special Agent Jeffrey Jamar, dated May 19, 1989, to support this contention.
 
 
 51
 The interpretation of this law enforcement exemption is also an issue of first impression in this circuit. Other circuits have defined somewhat differently the standard applicable to determining whether the exemption permits maintaining records on the exercise of First Amendment rights.[6] We are satisfied, however, that the FBI has met its burden of establishing that maintenance of the records is "pertinent to and within the scope of an authorized law enforcement activity," 5 U.S.C. Sec. 552a(e)(7), as articulated by every circuit which has faced the issue. The district court's order of June 5, 1989, following its in camera, ex parte examination of materials submitted by the FBI, concluded that the FBI had probable cause to seize the photographs. Thus, we believe that these records fall within the law enforcement exemption of the Privacy Act.[7] We prefer to delay a closer scrutiny of the law enforcement exemption until the issue is more carefully framed and necessary to the decision.
 
 IV.
 
 52
 Finally, Wabun-Inini contends that the district court committed prejudicial error by accepting the FBI's ex parte, in camera submission without requiring the FBI to make a detailed public record explaining the relevance of the submission and identifying the basis of the claim of privilege.
 
 
 53
 "Ex parte, in camera hearings are part of a trial judge's procedural arsenal...." United States v. Southard, 700 F.2d 1, 11 (1st Cir.), cert. denied sub nom. 464 U.S. 823, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983). However, since they are "conducted without benefit of criticism and illumination by a party with the actual interest in forcing disclosure," Phillippi v. Central Intelligence Agency, 546 F.2d 1009, 1013 (D.C.Cir.1976) (quoting Vaughn v. Rosen, 484 F.2d 820, 825 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974)), a court must require that the offering party provide detailed public justification supporting the right to examination. Id.
 
 
 54
 The FBI's memorandum in support of the examination was essentially a description of various situations where courts have permitted ex parte, in camera hearings, such as cases involving informants, the Freedom of Information Act, and discovery privileges. The memorandum did not specify which claim of privilege applied to the FBI's submission. At a later date, after the court had viewed the submission, FBI Special Agent Jeffrey Jamar provided more detail about the ex parte, in camera examination in a declaration. He stated that the "content and nature of the [declarations of FBI personnel submitted for ex parte, in camera examination] cannot be publicly disclosed. To do so would reveal sensitive information compiled for law enforcement purposes and would impede a pending investigation." Declaration of Jeffrey Jamar, June 20, 1989.
 
 
 55
 We review the district court's receipt of an ex parte, in camera submission under an abuse of discretion standard. Southard, 700 F.2d at 11; Campbell v. Department of Health & Human Serv., 682 F.2d 256, 265 (D.C.Cir.1982). The court below faced the difficult task of requiring sufficient public justification and "yet do so without forcing a disclosure of the very thing the privilege is designed to protect." United States v. Reynolds, 345 U.S. 1, 8, 73 S.Ct. 528, 532, 97 L.Ed. 727 (1953). Wabun-Inini argues that the court should have required the FBI to provide more detailed information in support of the examination and that its supporting memorandum was untimely. The FBI contends that it was not possible to disclose more information without impeding its law enforcement investigation. While more detailed information would have certainly aided our task here, we are convinced that the FBI has met its burden here. Accordingly, the court did not abuse its discretion in viewing the ex parte, in camera submission.
 
 V.
 
 56
 In conclusion, we hold that Wabun-Inini is not entitled to injunctive relief on either his Fourth Amendment claim or his Privacy Act claim, and that the district court did not abuse its discretion in viewing the ex parte, in camera submission by the FBI. Accordingly, we affirm the judgment of the district court.
 
 
 
 [1]
 The Honorable Donald D. Alsop, Chief Judge of the United States District Court for the District of Minnesota
 
 
 [2]
 Processing for black and white photographs was not done on the premises; Wabun-Inini places great emphasis on this fact. We believe, however, that it has no relevance to our inquiry here because the photographs in issue were color and the parties stipulated that the photographs were developed on site and conveyed through the Noritsu viewing window
 
 
 [3]
 The district court granted partial summary judgment to the Government only on the Fourth Amendment issue, even though the Government had requested summary judgment on all claims. We elect to exercise our discretion here, however, to resolve all issues on the merits where "a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance." Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 757, 106 S.Ct. 2169, 2177, 90 L.Ed.2d 779 (1986); see Union Nat'l Bank of Little Rock v. Federal Nat'l Mortgage Ass'n, 860 F.2d 847, 852 (8th Cir.1988)
 
 
 [4]
 In United States v. Apker, 705 F.2d 293 (8th Cir.), aff'd, United States v. Fitzgerald, 724 F.2d 633 (8th Cir.1983) (en banc), cert. denied, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 538 (1984), a case which was not cited by either party, we held that the "scrupulous exactitude" standard applied to a search which did not involve a prior restraint but did potentially implicate First Amendment associational rights. Id. at 301. That decision, however, does not change our conclusion here. While an earlier decision is binding on this panel, United States v. White Horse, 807 F.2d 1426, 1430 (8th Cir.1986), we are compelled to follow intervening Supreme Court precedent. Since Apker, the Court has made clear that the basis for special scrutiny given searches and seizures involving materials protected by the First Amendment is the risk posed by prior restraints. Macon, 472 U.S. at 470, 105 S.Ct. at 2782-83
 Our holding here is consistent with the Ninth Circuit's recent decision in United States v. Aguilar, 883 F.2d 662 (9th Cir.), petition for cert. filed (U.S. Dec. 1, 1989) (No. 89-6214). In Aguilar, the court rejected the opportunity to apply a heightened standard to a search, implicating First Amendment rights to freedom of association and free exercise, which involved an informer's infiltration of a church. Id. at 696-705.
 
 
 [5]
 The district court expressly rejected such a broad rule and based its holding on the fact that the Noritsu machine exposed the photographs to public view. The FBI, however, contends that Wabun-Inini, by voluntarily conveying the film to a third party, lost all reasonable expectation of privacy in it. See, e.g., Smith v. Maryland, 442 U.S. 735, 745, 99 S.Ct. 2577, 2582-83, 61 L.Ed.2d 220 (1979) (holding no objectively reasonable expectation of privacy in numbers dialed on the telephone); United States v. Miller, 425 U.S. 435, 442, 96 S.Ct. 1619, 1623-24, 48 L.Ed.2d 71 (1976) (holding no legitimate privacy expectation in checks and deposit slips given to bank); United States v. Taylor, 515 F.Supp. 1321, 1326 (D.Maine 1981) (holding no objectively reasonable expectation of privacy in photographs depicting apparent criminal activity developed from film left at photo processor because they were exposed to view of processor employees), aff'd, 683 F.2d 18 (1st Cir.), cert. denied, 459 U.S. 945, 103 S.Ct. 261, 74 L.Ed.2d 203 (1982); People v. Hebel, 174 Ill.App.3d 1, 25, 123 Ill.Dec. 592, 607, 527 N.E.2d 1367, 1382 (1988) (holding no legitimate privacy expectation in allegedly lewd photographs seized from photo processing store), cert. denied, --- U.S. ----, 109 S.Ct. 1544, 103 L.Ed.2d 848 (1989)
 Since we decide this case on narrower grounds, we need not resolve this issue. The FBI correctly recognizes that the Supreme Court has "held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed." United States v. Jacobsen, 466 U.S. 109, 117, 104 S.Ct. 1652, 1658-59, 80 L.Ed.2d 85 (1984) (quoting United States v. Miller, 425 U.S. at 443, 96 S.Ct. at 1624).
 This broad declaration, however, does not necessarily encompass the situation before us. While the Court has interpreted the Fourth Amendment as proscribing only governmental, and not private, action, id. 466 U.S. at 113, 104 S.Ct. at 1656, it is not clear that the action here would fall into the latter category. A private search or seizure is one conducted "by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." Id. (quoting Walter v. United States, 447 U.S. 649, 662, 100 S.Ct. 2395, 2404, 65 L.Ed.2d 410 (1980) (Blackmun, J., dissenting)); see Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921); see, e.g., Corngold v. United States, 367 F.2d 1, 4-5 (9th Cir.1966) (holding that search by private individual at government request was not a "private search"). It is not certain here that the F-Stop employees acted as private individuals in giving the photographs to the FBI. Regardless, we need not resolve the issue here.
 
 
 [6]
 The Third Circuit, in Patterson v. FBI, 893 F.2d 595 (3d Cir.1990), recently adopted a rule requiring agencies "to demonstrate that any and all records maintained on an individual's exercise of First Amendment rights are relevant to an authorized law enforcement activity of the agency, and that there exists a sufficient basis for the maintenance of such records." Id. at 602 (quoting lower court, 705 F.Supp. 1033, 1043 (D.N.J.1989)) (emphasis added). In MacPherson v. IRS, 803 F.2d 479 (9th Cir.1986), the Ninth Circuit rejected a standardized approach for determining whether a record of First Amendment activity is exempted as authorized law enforcement activity. Its approach is "to consider the factors for and against the maintenance of such records of First Amendment activities on an individual, case-by-case basis." Id. at 484
 In Jabara v. Webster, 691 F.2d 272 (6th Cir.1982), cert. denied, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), the Sixth Circuit adopted a relevancy standard, similar to that in Patterson, which permits "investigation with respect to the exercise of first amendment rights if such investigation is relevant to an authorized criminal investigation or to an authorized intelligence or administrative one." Id. at 279-80 (emphasis added). The District of Columbia Circuit has adopted the same standard. Nagel v. United States Dep't of Health, Educ. & Welfare, 725 F.2d 1438, 1441-42 n. 3 (D.C.Cir.1984). Finally, the Eleventh Circuit has held that, to the extent the agency "has engaged in the practice of collecting protected information, unconnected to any investigation of past, present or anticipated violations of the statutes which it is authorized to enforce," section 552a(e)(7) has been violated. Clarkson, 678 F.2d at 1375 (emphasis added).
 We need not resolve whether there are practical, as opposed to semantic, differences in the interpretations articulated by other circuits.
 
 
 [7]
 While the court's order of August 18, 1989, declined to reach the merits of Wabun-Inini's Privacy Act claim, we elect to exercise our discretion here to resolve this issue on the merits, see supra note 3, because the FBI has presented sufficient evidence to resolve the issue of whether the law enforcement exemption applies. While there was some confusion on the issue at oral argument, we believe that remanding for a hearing would be of little value here